UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 17-50144 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM IN SUPPORT OF |
| v. | ) | DEFENDANT'S MOTION TO |
| | ) | SUPPRESS EVIDENCE OBTAINED |
| DANA FAULKNER | ) | FROM STOP |
| | ) | |
| Defendant. | ) | |

## FACTS

On August 28, 2017, Department of Criminal Investigations, Investigator Casey Kenrick advised Rapid City Police Officers Sensac and Raetz that there was probable cause to stop a vehicle being driven by the subject of a drug investigation - "Diablo." An advisement was given that "Diablo," was known to carry several weapons and was using cocaine. Kenrick advised to respond to an area of Cambell Street and E. Saint Patrick Street. Kenrick then advised a white BMW with Colorado license plate VQY957 was turning eastbound onto East Saint Patrick Street from Creek Drive. Kenrick advised that the subject driving the white BMW was "Diablo," and that the vehicle should be stopped. Officers Raetz and Sensac were not given any physical description of the vehicle's occupant, nor his criminal history nor his nationality, nor his age, nor his height or weight. The vehicle committed no traffic violations prior to the stop.

Upon the stop of the vehicle, both officers drew their weapons and gave commands for the driver of the vehicle to exit. Upon exiting the vehicle, Faulkner advised he was carrying a pistol in his back waistband. Faulkner was then commanded to get on his knees and then on his stomach. He was then handcuffed on the ground in a prone position immediately after the stop

and arrested. On the way back to the police car Faulkner requested to speak with a lawyer and advised he would not answer any questions. Arresting Officer Raetz advised he would be sure not to ask him any questions.

Faulkner was then asked by Officer Raetz if he had a license to carry a concealed weapon. He replied or indicated he did not. Officer Sensac or Raetz then radioed a NCIC check on the status of the weapon.

Officers Sensac, Raetz and Doyle met at the opened door of the BMW and discussed how to proceed. Sensac advised that Faulkner was carrying a concealed weapon without a license, evidence obtained from the questioning of Faulkner. Doyle indicate to "write the ticket," and that he would inventory search the vehicle. Doyle asked why Faulkner was stopped and Sensac replied, "They said they had enough to get him pulled over."

Shortly thereafter the NCIC check that was run on the weapon seized from Faulkner came back as stolen. More Officers arrived on the scene and further discussion took place - ultimately the vehicle was inventory searched. An inventory search recovered a small amount of methamphetamine (2-4) grams, an alleged "owe sheet," a large amount of Colombian Pesos and a vape pen containing methamphetamine oil and two cellular telephones.

All evidence obtained on August 28, and thereafter should be suppressed as they were obtained as unlawful fruits of the poisonous tree Wong Sun v. United States, 371 US 471 (SC 1963).

This case is representative of a Terry stop which immediately becomes an arrest. The driver Faulkner is made to exit the vehicle at gunpoint, made to lie face down at gunpoint and then handcuffed behind his back and brought back to the police cruiser. He is therefore arrested

immediately or contemporaneously with the stop. Just seconds after the stop Faulkner's freedom

was curtailed in a very significant way and he was in custody. However, the arresting officers,

Sensac and Raetz who had nothing to do with the Diablo investigation did not know why they

had just arrested Faulkner and thus did not have probable cause to arrest him.

## FAULKNER WAS ARRESTED WITHOUT PROBABLE CAUSE SINCE HE WAS STOPPED AT GUNPOINT, MADE TO EXIT THE VEHICLE AT GUNPOINT, AND HANDCUFFED BY OFFICERS WHO DID NOT HAVE THE SUFFICIENT INFORMATION WHICH WOULD GIVE RISE TO PROBABLE CAUSE

Faulkner's arrest stop is based on a tip from a confidential informant. However, the

descriptive facts or descriptive information regarding the tip, which would or would not give rise

to probable cause to stop someone at gunpoint make them lie face down at gunpoint and then

handcuff them and make them sit in the back of a patrol car, were known only to Investigator

Kenrick. The information Investigator Kenrick gave Rapid City Police Officers Sensac and

Raetz who are not involved with the Diablo investigation only minutes before the stop was

devoid of the descriptive facts giving rise to probable cause.


As by Officer Raetz:

Inv. Kenrick advised "Diablo" was the subject of a drug investigation, and there was
probable cause for a traffic stop as soon as Inv. Kenrick was able to identify a suspect
vehicle. He requested Ofc. Senesac and I respond to the area of Cambell St. And E. St.
Patrick St. and to stand by until further notice. Inv. Kenrick further advised "Diablo" was
known to carry several weapons and was using cocaine. We were advised to conduct the
traffic stop accordingly.

As Ofc. Sensesac and I responded to the area. Inv. Kenrick contacted me via cell phone
and stated a white BMW bearing Colorado license plate VQY957 was turning eastbound
onto E. St. Patrick from Creek Dr. Inv. Kenrick advised the suspect driving the vehicle
was "Diablo" and he requested I stop the vehicle.

[Emphasis Added].

As by Officer Senesac:

Inv. Kenrick advised "Diablo" was most likely armed with a firearm. Inv. Kenrick requested Officer Raetz and I go to the Sinclair gas station at the intersection of Cambell St. and E. Saint Patrick St. Inv. Kenrick advised "Diablo" was the subject of a drug investigation, and there was probable cause for a traffic stop as soon as Inv. Kenrick was able to identify a suspect vehicle. While Officer Raetz and I were arriving at the gas station Officer Raetz received information that "Diablo" was currently traveling eastbound on E. Saint Patrick St. I followed Officer Raetz who conducted a traffic stop at 2225 E. Saint Patrick St. Due to the information about "Diablo" being armed I positioned my car to the right of Officer Raetz and began to cover the car using my duty pistol.

[Emphasis added].

This is similar to  Whiteley v. Warden, Wyo. State Penitentiary, 401 US 560 (SC 1971). Although that case dealt with the issuance of an arrest warrant by a magistrate without any facts to support it, the case reasoning is sound:

That complaint consists of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint. The actual basis for Sheriff Ogburn's conclusion was an informer's tip, but that fact, as well as every other operative fact, is omitted from the complaint. Under the cases just cited, that document alone could not support the independent judgment of a disinterested magistrate.

Whiteley at 565. In this case Officers Sensac and Raetz arrested Faulkner when they stopped him

at gunpoint, made him lie face down at gunpoint and then handcuffed him and made him sit in

the back of the patrol car-all based on Investigator Kenrick's conclusory statements which did

come from an informant but which were unknown to Officers Sensac and Raetz.

The information Investigator Kenrick knew but did not tell Officers Sensac and Raetz at

the time is not imputed to Officers Sensac and Raetz simply because they are all law

enforcement officers, since:

Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the *arresting officer* at the time of the arrest. Id. Citing Maryland v. Pringle, 540 U. S. 366, 371 (2003).

[Emphasis Added].

Whether or not a suspect is in custody is based on a reasonable person standard:

As noted supra, Berkemer instructs that the "only relevant inquiry [when determining if a suspect is in `custody'] is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442, 104 S.Ct. at 3151. A reasonable man in Mr. Perdue's position could not have misunderstood the fact that if he did not immediately cooperate, his life would be in danger. Any reasonable person in Mr. Perdue's position would have felt "completely at the mercy of the police." *Berkemer,* 468 U.S. at 438, 104 S.Ct. at 3149. We therefore find as a matter of law that Mr. Perdue was in police custody during the initial questioning by Officer Carreno.

US v. Perdue, 8 F. 3d 1455 (10th Cir 1993). Unlike the present case, the arresting officers in Perdue were the investigating officers. In this case, Rapid City, Police Officers Sensac and Raetz seem to have been called in last minute to make the arrest.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. Devenpeck v. Alford, 543 US 146 (S.C. 2004).

In this case, the only facts known to Officers Sensac and Raetz are those facts given to them by Investigator Kenrick- "Diablo," was the subject of a drug investigation and there was probable cause for a traffic stop as soon as Investigator Kenrick was able to identify a suspect vehicle. [Emphasis Added].

Officer Senesac begins the stop at 15:59:16 on his dispatch log.

On the way back to the police cruiser in handcuffs, at 16:01:10 and in the presence of both Officers, Faulkner states, "I want an attorney present for all questioning." Officer Raetz replies, "I'll be sure not to ask you anything." At this point Faulkner has unequivocally requested an attorney. He has done so because he knows and understands he is under arrest and that his freedom has been curtailed in a significant way.

Officer Raetz unequivocally commits to an understanding of this invocation and arrest by replying, "I'll be sure not to ask you anything." Faulkner invokes a second time at minute 16:02:10, Faulkner states, "Can you call an attorney for me to be present at all searches or anything?" Officer Sensac replies, "We do not do anything like that."

At 16:02:11, In response to a question from Faulkner as to, what is going on? Officer Raetz says, "as soon as I know everything that's going on, I'll know what we can tell you. This is stated because neither Raetz nor Sensac know why they have arrested Faulkner.

Officer Sensac logs Faulkner's arrest officially in the dispatch log at 16:02:44.

Faulkner's arrest is officially logged at 16:02:44, some three and a half minutes after the gunpoint stop and arrest. No drugs have been found on Faulkner's person, law enforcement does not know the gun on Faulkner was stolen and law enforcement does not know Faulkner is concealing a weapon without a permit. Investigator Kenrick is nowhere to be found on scene until some nine minutes after the stop.

From the time of the stop until the arrest, no probable cause exists to arrest Faulkner. Some five minutes after Faulkner has been arrested the following exchange takes place:

At 16:07:02, K9 Officer Doyle: "What was the reason for the stop."
Sensac responds, "They said they had enough to get him pulled over."

Because Faulkner's arrest occurred by Rapid City, Police Officer Sensac and Raetz who did not have sufficient information to obtain probable cause for his arrest, all evidence obtained after his arrest should be suppressed.

## ANY PROBABLE CAUSE FOR THE POST STOP ARREST OF FAULKNER WAS BASED ON A VIOLATION OF FAULKNER'S MIRANDA AND MARYLAND V. SHATZNER RIGHTS

On the way back to the police cruiser in handcuffs, at 16:01:10 and in the presence of both Officers, Faulkner states, "I want an attorney present for all questioning." Officer Raetz replies, "I'll be sure not to ask you anything." At this point Faulkner has unequivocally requested an attorney and he has done so because he understands he is under arrest. Officer Raetz unequivocally commits to an understanding of this invocation and knowledge of the arrest by replying, "I'll be sure not to ask you anything." Faulkner invokes a second time at minute 16:02:10, Faulkner states, "Can you call an attorney for me to be present at all searches or anything?" Officer Sensac replies, "We do not do anything like that." Officer Sensac logs Faulkner's arrest officially in the dispatch log at 16:02:44.

However, Raetz does question Faulkner in direct violation of Faulkner's invocation of counsel and after his arrest without Miranda warnings. At 16:04:01, Officer Raetz asks Faulkner, "Is your concealed carry permit in there?" Do you have a concealed carry permit in there?" You do not have a concealed carry permit in there?" Faulkner's responds in the negative. This class one misdemeanor arrestable offense, is used as probable cause to search the serial number from the weapon obtained on Faulkner.

In Miranda v. Arizona 384 US 436, (S Ct. 1966), the U.S. Supreme Court held that procedural safeguards must be employed to secure the privilege against self-incrimination, when ever a suspect is in custody and subject to interrogation. Those safeguards include an advisement of the right to remain silent and an advisement that anything said by the suspect may be used against him as evidence. In addition to that advisement, the suspect is advised that he has the right to an attorney either appointed or retained. Accordingly, law enforcement must refrain from doing certain things if the suspect indicates he wishes to exercise his rights against self-incrimination. "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Id at 445.

Faulkner's questioning of whether or not he had a concealed to carry permit was in violation of Miranda. This statement was obtained when Miranda warnings should have been given but were not, and the statement was obtained over an unequivocal invocation of Faulkner's sixth amendment right to counsel. Under the law Faulkner could not be subject to any further questioning for at least 14 days, Maryland v. Shatzer, 130 S. Ct. 1213, (SC 2010).

Faulkner's statements were truly used against him. He was not asked a single time, he was subjected to the same question three times by an Officer who told him he would be sure not

to ask him anything. The question asked was absolutely one designed to solicit an incriminating response.

With the information that Faulkner had been concealing a firearm without a permit, Officer Raetz took this to mean probable cause to search the weapon's serial number as he then ran an NCIC radio check on the weapon at 16:05:31. Dispatch radioed back at 16:07:28 that the weapon was stolen.

## THE TIP LACKED INDICIA OF RELIABILITY NECESSARY TO JUSTIFY THE STOP AND ARREST OF FAULKNER

In arguendo, the determination of probable cause[ based on a tip] does not "`rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circumstances.'" US v. Morales, 923 F. 2d 621 (8th Cir 1991) *Warren v. City of Lincoln,* 864 F.2d 1436, 1440 (8th Cir.) (quoting United States v. Archer, 840 F.2d 567, 573 (8th Cir.1988)), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989).

The totality of the circumstances test as to informant reliability, has been dealt with by establishing whether or not: 1) The informant has supplied credible information in the past, 2), whether the informant supplied detailed information about the appearance and future actions of the accused US v. Morales, at 624.

It is unknown to the undersigned what physical description was provided by the confidential informant regarding "Diablo," as none of that information if it exist was found in the provided discovery.

The vehicle the confidential informant identified as being driven by "Diablo," was unknown to the confidential informant until only moments prior to the stop. "And there was

probable cause for a traffic stop as soon as Inv. Kenrich was able to identify a suspect vehicle."
Sensac Report Pp 1. Officers Raetz and Sensac were on their way to the apparent location, the
Sinclair gas station, when suddenly they were given orders to pull over a white BMW which was
traveling eastbound on E. Saint Patrick St.

The confidential informant made no predictions of Dana Faulkner's future actions.
"While Officer Raetz and I were arriving at the gas station Officer Raetz received information
that "Diablo" was currently traveling eastbound on E. Saint Patrick St." Sensac Report Pp1.
Either the confidential informant provided a global non-specific locations or failed to accurately
predict future actions.

It is unknown whether or not the confidential informant has provided truthful reliable
information in the past.

Equally important is independent police corroboration or the tip's features or facets. The
Court in Morales cited  Illinois v. Gates, 462 US 213 - Supreme Court 1983, in Gates, police
received an anonymous tip letter relaying that the Gates were involved in trafficking drugs. The
letter detailed that Sue Gates would drive her car to Florida and obtain a load of drugs. Lance
Gates would then fly down to Florida and drive their car back to Illinois. Sue would fly home.

 Police were able to confirm L. Gates had a scheduled flight to Florida. Police watched
Lance board the plane, and knew through police corroboration that he arrived in Florida and
drove to a hotel. Once at the hotel he went into a room rented to Susan Gates. The next day
Lance and an unidentified woman left in a vehicle with Illinois license plates and turned on to an
interstate used frequently by Illinois travelers just prior to the stop.

Compare with the present case, wherein, the informant gave a location of Dana Faulkner minutes before police arrived and a description of the vehicle only seconds before the stop.

The Court in <u>Morales</u> also cited <u>Draper v. United States</u>, 358 US 307 (SC 1959). This case dealt with a known informant who had provided accurate information multiple times in the past for money. His tip was:

> Four days later, on September 7, Hereford (informant) told Marsh "that Draper had gone to Chicago the day before [September 6] by train [and] that he was going to bring back three ounces of heroin [and] that he would return to Denver either on the morning of the 8th of September or the morning of the 9th of September also by train." Hereford also gave Marsh a detailed physical description of Draper and of the clothing he was wearing,[2] and said that he would be carrying "a tan zipper bag," and that he habitually "walked real fast."

<u>Draper</u> at 309.

> Repeating the process on the morning of September 9, they saw a person, having the exact physical attributes and wearing the precise clothing described by Hereford, alight from an incoming Chicago train and start walking "fast" toward the exit. He was carrying a tan zipper bag in his right hand and the left was thrust in his raincoat pocket.

<u>Draper</u> at 310. In comparison the confidential informant in the present case, gave a non-precise location of the vehicle minutes before Sensac and Raetz arrived and described the vehicle only seconds prior to the stop.

The Court in <u>Morales</u> also cites <u>US v. Reiner Ramos</u>, 818 F. 2d 1392 (8th Cir1987). In that case,

> Informant No. 1 told Bohlig that Ramos brought four- to six-pound quantities of cocaine to St. Paul from Miami, Florida on quick turn-around flights about every two weeks. He described Ramos to Bohlig as being short, about 45 years old, light-skinned, and Hispanic. He said that Ramos did not speak English. He also said that Ramos traveled with a female companion and that when Ramos was in the Minneapolis-St. Paul area, he

stayed at either the Holiday Inn near the State Capitol Building or at the Quality Inn near the St. Paul Civic Center. Informant No. 1 told Bohlig that he had seen Ramos in a hotel in St. Paul with cocaine and customers present.

On March 3, 1986, Informant No. 1 told Bohlig that Ramos and his female companion were at the Holiday Inn near the State Capitol Building, in Room 510. By the time the police arrived, Ramos and his companion had departed. A search of Room 510 turned up two discarded airline boarding passes and tickets showing a March 2, 1986 flight from Miami to Minneapolis-St. Paul by Mr. Roberto Ramos and Mrs. Elsa Ramos.

On March 28, this informant reported that Ramos and Mrs. Coridao Gonzalez were traveling together on Northwest Flight 719 to Minneapolis-St. Paul. Airline employees verified their presence on the plane and described Ramos as a light-skinned Hispanic, short, in his 40's, and wearing a dark suit. His companion was described as a middle-aged woman with reddish hair wearing slacks and a floral print blouse. The two were scheduled to return to Miami on March 30.

Ramos at 1393.

 Morales, Draper, Gates, and Ramos all share the same features: an informant gives a detailed description of the drug operation/activities and the defendant, the police then corroborate the details the informant has given regarding the operation/activities and the defendant. Probable cause is then established if the details match up with what the police see in their investigation. If there are enough details and enough details match up with what the police see, then the police are justified in believing the informant is probably telling the truth and probable cause is established.

In this case the police investigated the informants but not the things the informants were saying. Or if they did investigate the things the informants told them, those things turned out not to be true.

NO CORROBORATING POLICE WORK AND PER SE LACK OF RELIABILITY

In this case there is no corroborating police work as to the details of the the informants stories but instead an investigation into the informants and what can only be described as a series of disconnected and contradictory stories which in themselves show lack of police corroboration. As found in the Indictment:

3). On 6/28/17 SOI #1 informed law enforcement that his/her drug supplied goes by "Kidd." SOI#1 described Kidd's boss as being named "Diablo." Diablo showed up at SOI#1's residence with a gun and said that "Diablo" was holding SOI#1 responsible for a $25,000 drug debt. SOI# denied owing "Diablo $25,000 and believed it was from either a drug deal gone bad or a seizure of drugs by law enforcement.

Interestingly SOI#1 does not know the specifics as to why "Daiblo," believes SOI#1 owes him $25,000 or how the $25,000 drug debt was incurred.

4). SOI #1 explained a few days before the interview he/she was at SOI#2's residence. SOI#2's residence. SOI#2 requested SOI#1's help to pick up a car in Meade County. SOI#1 agreed to help. Once SOI#2 and SOI#1 arrived, SOI#2 stopped on a dirt road where there was another car. SOI#1 saw "Diablo" in the car, was fearful of "Diablo," exited SOI#2's car and fled to avoid "Diablo." SOI#1 turned himself in to law enforcement in order to elude "Diablo."

It appears from this paragraph that SOI#2 and SOI#1 were riding in car being driven by SOI#2 to some location on a dirt road in Meade County. Upon parking and seeing Diablo parked in another vehicle, SOI#1 believed he was going to be killed or harmed by Diablo and so exited the vehicle and was able to outrun on foot, Diablo who was in a motor vehicle.

One would hypothesize Diablo would want to kill SOI#1 for the $25,000 drug debt that was accrued for some reason and that SOI#1 was being held responsible for, for some reason. However, as we find out in the next paragraph, the drug debt that SOI#1 had not caused but was

being held responsible for, for some unknown reason, had already been paid weeks ago under an agreement with Diablo at Watiki.

> 5). SOI#1 went on to tell law enforcement that before going to Meade County with SOI#2, SOI#1 had met with "Diablo" at Watiki Water Park in Rapid City. SOI#1 received one pound of methamphetamine from "Diablo" at that time, which he/she later sold. SOI#1 understood this arrangement was payment for the debt "Diablo" was holding SOI#1 accountable for.

Put simply, for unknown reasons Diablo holds SOI#1 responsible for a $25,000 drug debt accrued for unknown reasons. SOI#1 sells one pound of meth for Diablo in exchange for release of the debt, but Diablo still wants to kill SOI#1, but SOI#1 who is on foot is able to out maneuver Diablo who is in a car. SOI#1's story lacks credibility and also lacks reliability as SOI#1's information as to Diablo's routine is contradictory:

> 6). SOI# 1 also informed law enforcement that SOI#4 sold multiple pounds of methamphetamine and heroin for "Diablo." Additionally, SOI #1 informed law enforcement that SOI#3 dealt multiple pounds of methamphetamine for "Diablo" [SOI#1?] Diablo's practice is to bring heroin methamphetamine, and cocaine in the tires of whichever vehicle he transports the controlled substances in from Colorado to South Dakota. Once "Diablo" arrives in Rapid City, he goes to SOI#3's house and unloads the controlled substances, which are further distributed from SOI#3's house to others.

Paragraph 6 is a contradiction to paragraph 5 as to Diablo's routines. Paragraph 5 states that Diablo met SOI#1 at Watiki Water Park and distributed one pound of meth to him/her. Paragraph 6 states Diablo's practice is to bring heroin and methamphetamine in the tires of whichever vehicle he transports the controlled substances in from Colorado to South Dakota. Unless SOI#3 lives at the adjoining hotel to Watiki, these two paragraphs contradict. Furthermore, SOI#1 describes Diablo's mode of transportation as, "whichever vehicle." Whichever vehicle is any vehicle on the planet and this provides no tangible qualities necessary to identify Diablo.

The unloading of methamphetamine and heroin from the tires of, "whichever vehicle," Diablo drives on "whichever day(s)" he delivers his methamphetamine at SOI#3's house or at Watiki or at someplace else, was not corroborated by independent police work and it could have been if what SOI#1 is saying is the truth since, SOI#1 began talking to law enforcement on 6/28/17 and SOI#3 was not arrested until August 2, 2017 and according to SOI#6 Diablo brings 20 pounds of methamphetamine to Rapid City, one to three times per week.

Presumably then, anywhere from 80 to 240 pounds of meth and some amount of heroin, were brought to SOI#3's residence by Diablo post 6/28/17 when law enforcement just happened to not be watching. Or did law enforcement watch SOI#3's residence and not see Diablo? Assumably law enforcement would have acted on this information the day they heard it and surveilled SOI#3's house until Diablo arrived and started removing the tires from the vehicle, prior to his arrest.

Paragraph 8 is a contradiction between SOI#1's story and SOI#2's story. In paragraph 8, SOI#2 states in part:

> Once SOI#2 was in the room, "Diablo" came out of the back of the room. "Diablo," threatened SOI#2 with a firearm and accused SOI#2 of hiding SOI#1 from him. SOI#2 was now on the hook for the $25,000 SOI#1 owes "Diablo." Diablo threatened (sic) SOI#2's family if SOI#2 did not cooperate. <u>A few days later, SOI #2 dropped SOI#1 off where "Diablo" requested (in Meade County). This was confirmed by what SOI#1 told law enforcement (as described in paragraph 3).</u>

This was not confirmed by SOI#1. According to SOI#1, SOI#1 was not "dropped off," but rather saw Diablo in another vehicle, exited the vehicle and "fled."

Paragraph 9 states that Diablo gives SOI#2 some methamphetamine to distribute every

week.

Paragraph 10, states that on August 2, 2017 SOI#3 was stopped by police with $16,000 in cash...started to cry because of Diablo's threats of violence.

Paragraph 11, states
On August 7, 2017 SOI#2 informed law enforcement that "Diablo," told him/her that "Diablo" was going to take three people out of the equation during the upcoming week. SOI#2 did not know who the three people were and "Diablo," did not tell SOI#2 the identities. SOI#2 believes that "Diablo," meant he was going to kill people.

This statement on August 7, 2017 bears directly against the reliability of the SOI#2. Was Diablo in Rapid City, during the week of August 14? Did he "take three people," out? All under the nose of law enforcement. Was it during one of his 20 pound tri-weekly trips to Rapid City? If SOI#2's information was credible would not Diablo have been arrested during the week of August 14th for attempted murder?

Paragraph 12 states in part, on 8/10/17 SOI#3 was interviewed by law enforcement. SOI#3 explained he/she was in debt to "Diablo," for $150,000 for illegal drugs he/she has received from "Diablo."

According to SOI#s 1 and 2, both of their lives were in jeopardy over $25,000 even after it had been paid. SOI#3 claims to owe $150,000 to Diablo and makes no mention of his life being threatened directly by Diablo. He also makes no mention of his home being used to distribute hundreds of pounds of meth.

Paragraph 13 states in part, on 8/21/17 law enforcement interviewed SOI#6. SOI#6 states he/she met "Diablo," through SOI#1 in May of 2017....SOI#6 advised that during the first week "Diablo" was in town, he/she helped move thirty (30) pounds of methamphetamine for "Diablo" with SOI#3, SOI#1 and SOI#4. SOI#6 advised that

"Diablo" would bring 10-20 pounds of methamphetamine to the Rapid City area one to three times per week.

Interestingly Paragraph 6 is the first time SOI#6 is mentioned. However, SOI#6 does not state where the methamphetamine is distributed, what kind of vehicle Diablo drives, or even what he looks like.

Finally, the most telling part of the investigation comes from paragraph 14, it provides:

> On 8/28/17 law enforcement received information that "Diablo" wanted to meet with the SOI#2 to collect $5,000 of an owed drug debt. Law enforcement advised SOI#2 not to meet with "Diablo," as information was received that "Diablo," wished to kill him/her. A confidential Informant (CI) provided the location of where "Diablo," wanted to meet and law enforcement set up surveillance at that location. The CI also provided a description of the vehicle "Diablo" was driving as a white BMW….

No independent police work corroborated any of the tips from the 6 informants. It would appear as though what the informants said proved to be untrue since Diablo was not arrested during any of the tri-weekly methamphetamine deposits at SOI#3's home post 6/28/17. And since Diablo was not arrested during the week of August 14th.

## NO POSSIBILITY FOR INDICIA OF RELIABILITY

The police did not verify any information the informants gave to them through independent police work. When the police are actually given a tip which proves to produce an actual person, there are no details to verify.

The vehicle description was provided only some 10 or 20 seconds before the stop.

Officers Raetz and Sensac were provided with a location to surveil only minutes before the stop.

The fact that police were not more prepared may go to show a lack reliability from previous occasions. The information given was:

> "Diablo" was the subject of a drug investigation, and there was probable cause for a traffic stop as soon as Inv. Kenrick was able to identify a suspect vehicle. Inv. Kenrick further advised "Diablo" was known to carry several weapons, and was using cocaine.

Minutes later, "while officer Raetz and I were arriving at the gas station Officer Raetz received information that "Diablo" was currently traveling eastbound on E. Saint Patrick St."

This is a heavy contrast to Illinois v. Gates, wherein police verified every facet of what the informant had said. The informant had written that Susan Gates travels to Florida in the family vehicle. When she gets to Florida she loads up with drugs. Her husband then flys down to meet her in Florida and Susan gates flys back to Illinois. In that case the police verified L. Gates bought a plane ticket to Florida. They watched him get on the plane and coordinated with local police to watch him get off the plane. They followed him to a hotel and watched him go into a room rented to a Susan Gates. The next day they watched him leave with an unknown woman in a car with Illinois plates and they followed him until he took an interstate exit used frequently by Chicagoans going home.

This case is akin to Gates if the police had only read the informant's letter and waited outside the Gates' home to stop and arrest them as soon as the informant pointed out which car they were driving.

Or if in US. v. Morales the confidential informant had said, "he'll be at the bus stop sometime today I'll point him out to you when I see him. Instead of saying,

> a black Cuban male known as "Chico" would depart by bus from the Minneapolis Greyhound Bus Depot at about noon that day with one kilogram or more of cocaine. The

informant described Chico as about 5'8" tall, weighing 140 to 150 pounds, 20 to 30 years old, with short black hair. The informant stated that Chico's destination was New York and that he would be carrying a small black bag and a small shiny handgun. The informant also stated that Chico would be wearing jeans, high-top tennis shoes, and a black T-shirt.

And,

The informant further stated that Chico would arrive at 3:20 p.m. in a red pick-up truck with a white topper.

Morales at 623.

Infact when law-enforcement does receive at tip that actually produces a person, it is not even a tip that has to do with trafficking meth and heroin to Rapid City, instead it is a tip that Diablo is coming to collect money. These are facts any law abiding citizen could match.

Understanding that he capriciously questioned Faulkner without Mirandizing him and over an invocation of counsel, or out of a strong desire to search the vehicle's trunk, Officers Holt, Raetz, Sensac, Doyle and Investigator Kennrick proceeded with an inventory search of the vehicle, at 16:12:30. To remove all doubt that this was an inventory search of the vehicle and not any search incident to an arrest, ATF Special Agent Korth stated under oath,in the search warrant,

An inventory of the vehicle was conducted prior to towing as consistent with Rapid City Police policy. During the inventory, a vap (sic) pen with a substance consistent with methamphetamine oil was located in the driver side door. Officers also located a backpack in the back seat that contained 2-4 grams of a substance that is consistent with methamphetamine and an extensive owe sheet related to drug distribution. Two cell phones were seized from Faulkner and are identified in Attachment A.

Search Warrant Pp 11.

The indictment in this case, provides,

An inventory of the vehicle was conducted prior to towing. During the inventory a vape pen with a substance consistent with methamphetamine was located in the drivers side door.

Indictment Pp 6. No articulation was stated in any of the discovery as to how law enforcement was able to identify the substance in the "vape pen," as methamphetamine oil without a warrant or without a search of the substance by chemical means, when the pen was chemically tested and why.

## THE STATE LACKED AUTHORITY TO CONDUCT AN INVENTORY SEARCH OF FAULKNER'S VEHICLE

An inventory search required two conditions be met: 1) the vehicle must be lawfully impounded and 2) the inventory search must be conducted in accordance with the local jurisdiction's policies on inventory searches. The arresting officers never invoked a need to lawfully impound the vehicle as it's never asked if either the vehicle's position in a private parking lot would either represent a disruption to the owner of said lot or if Faulkner would have a point of contact who would be able to retrieve the vehicle on his behalf. In fact Faulkner requested an attorney to be present at the search of the vehicle. Certainly a retained attorney could have retrieved the vehicle. Had the vehicle represented an immediate disruption to the flow of traffic on a public street or if Faulkner didn't have a point of contact to take possession of the vehicle on his behalf, a lawful impound and inventory search may have been supported. Neither condition applies to this case and therefore, the need of the State to conduct an inventory search is not supported.

## FINDINGS OF THE INVENTORY SEARCH OF FAULKNER'S VEHICLE WERE BASED ON AN OVERREACH OF POLICE AUTHORITY

Inventory searches are to serve three purposes: 1) the need for law enforcement to to protect the owner's property while it remains in police custody, 2) protect the police against claims or disputes over lost or stolen property and 3) as necessary for the protection of the police from potential dangers that may be located in the property.

Since the arresting officers can not demonstrate a need to conduct an inventory search, it can only be concluded that their desire to search the car stemmed from their inherent desire to find additional evidence in support of Investigator Kennrick's accusation that the accused was a subject of a drug investigation. Unfortunately, Courts have specifically upheld that inventory searches can not be used as a primary means to discover evidence of a crime.

According to Florida v. Wells (1990):

> Our view that standardized criteria, *ibid.,* or established routine, *Illinois* v. *Lafayette,* 462 U. S. 640, 648 (1983), must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime," *Bertine,* 479 U. S., at 376 (BLACKMUN, J., concurring).
>
> [Emphasis Added]

In this case, as stated previously, there is no plausible explanation that the Rapid City Police Department or Investigator Kennrick, would have known the substance in the vape pen was "methamphetamine oil," and not nicotine glycerin-a substance commonly used by vape pen

enthusiast. Both liquified crystal methamphetamine and nicotine glycerin are amber in appearance. Outside using the substance, the only way to decipher the difference would be to submit the substance to chemical testing.

WHEREFORE THE DEFENDANT PRAYS FOR THE REASONS GIVEN HIS MOTION TO SUPPRESS BE GRANTED

FITZGERALD LAW FIRM
A Professional Law Corporation


 /s/John M. Fitzgerald
625 ½ Main Street; Ste 2
Rapid City, SD 57701
(605) 716-6272 Office
(888) 642-4341 Facsimile
john.fitzgerald@fitzgeraldfirm.com