UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 17-50144 |
| Plaintiff, | |
| | UNITED STATES' RESPONSE IN |
| v. | OPPOSITION TO DEFENDANT'S |
| | MOTION TO SUPPRESS |
| DANA FAULKNER, | |
| Defendant. | |

_____

COMES NOW the United States of America, by and through Assistant United States Attorney Kathryn N. Rich, to file this response in opposition to the defendant's motion to suppress. Doc. 38. The United States resists all the motion in all respects.

## STATEMENT OF FACTS

On August 28, 2017, Pennington County Sheriff's Investigator Casey Kenrick was contacted by a confidential informant (CI) previously known to Inv. Kenrick. The CI had been interviewed by law enforcement on earlier occasions regarding an individual known to the CI through narcotics distribution activities between them only as "Diablo." The CI had previously provided a physical description of Diablo to Inv. Kenrick and also indicated Diablo drove different vehicles. The Unified Narcotics Enforcement Team (UNET) had for many months received information from individuals that the person known as "Diablo" was distributing narcotics in the Rapid City area but had thus far been unable to

identify him by his true name. Additional facts regarding this information will be further developed below and at the hearing. The CI informed Inv. Kenrick Diablo had contacted the CI earlier that day and wanted to meet the CI in the area of Lombardy Drive and Creek Drive in Rapid City, SD because the CI owed Diablo money for drugs he/she had previously received from Diablo. The CI did not know what vehicle Diablo was driving but said he/she would drive over to see it. Based on safety concerns, Inv. Kenrick instructed the CI to not actually meet with Diablo. The CI, as well as members of UNET and other law enforcement reported to the area in unmarked and marked vehicles. The CI contacted Inv. Kenrick after observing Diablo in his vehicle and informed Inv. Kenrick that Diablo was driving a white BMW with Colorado license plates.

Just after receiving the vehicle description from the CI, Inv. Kenrick and another investigator observed a white BMW drive by them in the area of Lombardy Drive and Creek Drive. The driver matched the physical description previously provided to Inv. Kenrick by the CI and others who had personally met him.

At approximately 2:30 p.m., Rapid City Police Department (RCPD) Officers Nathaniel Senesac and Daniel Raetz were in contact with Inv. Kenrick. Inv. Kenrick informed the officers an individual he knew to go by the name "Diablo" was the subject of a drug investigation and that Inv. Kenrick believed there was probable cause to stop Diablo's vehicle. Inv. Kenrick also informed the officers Diablo was known to carry weapons and was a cocaine user. Inv. Kenrick advised the officers to wait near Campbell and East St. Patrick Streets, in Rapid

City, South Dakota. Inv. Kenrick described the vehicle to the officers that both he and the CI had just seen Diablo driving.

After receiving the information from Inv. Kenrick, Ofc. Raetz was stopped in his patrol vehicle at the intersection of East St. Patrick Street and Creek Drive, facing east.  He then observed a white BMW turning right from Creek Drive onto East St. Patrick St., heading east.  *See* Exhibit 1 (Ofc. Raetz's dash-camera video).[1]  Ofc. Senesac was immediately behind Ofc. Raetz.  Once the light turned green, Ofc. Raetz drove behind the white BMW, turned on his lights and sirens, and pulled the defendant over.  The defendant pulled over by turning right into a parking lot.  These events can also be observed on Ofc. Senesac's patrol dash-camera video. *See* Exhibit 2 (Ofc. Senesac's dash-camera video).[2]

Once all the vehicles were stopped, the defendant complied with Ofc. Raetz's commands to exit the vehicle with his hands up, holding two cell phones in one of his hands. As soon as the defendant exited his vehicle, he informed the officer he had a pistol in his waistband, and pointed at the waistband on his back.  Ofc. Raetz advised him not to reach for it.  Once the defendant was on his stomach, Ofc. Senesac approached, put handcuffs on the defendant, and removed the handgun from his waistband.  Once the firearm was safely removed, Ofc. Raetz assisted the defendant to stand.  Ofc. Raetz escorted the defendant back to Ofc. Senesac's vehicle.  While they were walking, the defendant asked

---

1. A disc of Ofc. Raetz's dash-cam video will be submitted to the Court as Exhibit 1.
2. A disc of Ofc. Senesac's dash-cam video will be submitted to the Court as Exhibit 2.

what the charges were.  Ofc. Raetz indicated he would inform the defendant when he had more information. RCPD Ofc. Sean Doyle also arrived on scene.

As the officer and the defendant approached the patrol vehicle, the defendant said, "I would like to have my attorney present." Ofc. Raetz acknowledged this by saying "Ok, I will be sure not to ask you anything."  As Ofc. Raetz was pat-searching the defendant before putting him in the backseat, the defendant gave him permission to search him, including looking into a wad of materials from his pocket including $1,774 cash, credit cards, and a Colorado Driver's License.

Ofc. Raetz confirmed the identification card belonged to the driver, Dana Faulkner (the defendant). The defendant asked about having an attorney present, but the officers indicated they do not do that on scene.  Approximately two minutes later, as the officers were completing routine tasks, Ofc. Raetz asked the defendant "Is your concealed carry permit in there?"  The defendant responded "no."  Ofc. Raetz then asked, "Do you have a concealed carry permit?" The defendant responded "no." Ofc. Raetz then confirmed the defendant had answered no.  Ofc. Senesac during this time frame contacts dispatch to run a status check of the serial number from the defendant's concealed firearm as well as the defendant's identifying information for warrants.

The RCPD officers conferred with each other while waiting to hear back from dispatch. Dispatch then informed them the firearm was reported stolen in Rapid City in May 2017.  The officers decided to conduct an inventory search of his vehicle.  Inv. Kenrick and other investigative agents arrived at the scene to

assist. During the search of the defendant's vehicle, law enforcement located: a glass pipe in a case, an Apple Macbook, an additional glass pipe wrapped in bubble wrap, a plastic bag with crystal substance inside, 6 yellow pills with "E20" markings, the defendant's United States Passport, pesos totaling 46,000, and a backpack containing a ledger that had handwritten entries appearing to be quantity and pricing sheets. Based on Inv. Kenrick's training and experience, the ledger appeared to relate to drug distribution.

The defendant was arrested by the RCPD officers for two offenses: carrying a concealed weapon without a valid permit in violation of SDCL § 22-14-9 and receiving stolen property (the firearm) in violation of SDCL § 22-30A-7. After the defendant's criminal history was confirmed the next day, an additional charge was added for possession of a firearm by a former violent offender in violation of SDCL § 22-14-15.

Law enforcement took a photo of the defendant, which was then shown to the CI and another Source of Information (SOI). Both individuals confirmed the defendant was Diablo. After the search was completed, the defendant's vehicle was towed by a towing company to a local SD Department of Transportation shop.

The United States anticipates presenting additional evidence regarding the extent of the investigation leading up to August 28. Specifically, the United States anticipates Inv. Kenrick will testify he and other law enforcement personally interviewed at least six people regarding "Diablo's" drug distribution in the Rapid City area. He will explain the information gathered from each of

them and how it compared to information from others. Inv. Kenrick will also testify to other law enforcement measures undertaken before August 28 by law enforcement to further the investigation.

## ARGUMENT AND AUTHORITIES

### A. Stop of the Defendant's Vehicle

The stop of the defendant's vehicle was lawful. "A traffic stop constitutes a seizure under the Fourth Amendment," and must be supported by either probable cause or an articulable suspicion that a violation of law has occurred." *United States v. Rowe,* 878 F.3d 623, 628 (8th Cir. 2017) (additional citations omitted); *see also United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 278 (2011) ("To constitute a reasonable seizure, a traffic stop must be supported by, at a minimum, 'a reasonable, articulable suspicion that criminal activity' is occurring."). Specifically regarding probable cause determinations in cases involving information from informants, the Eight Circuit held in *United States v. Hambrick*, 630 F.3d 742, 747 (8th Cir. 2011), "To support a probable cause determination, officers may rely on an informant's tip if the informant has provided reliable information in the past or if his tip is independently corroborated."

"Probable cause for the stop and search of [a] vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *Rowe*, 878 F.3d at 628; *see also United States v. Morales*, 238 F.3d 952, 954 (8th Cir. 2001). In this

case, RCPD officers stopped the defendant's vehicle after receiving information from Inv. Kenrick, with whom they were in communication. Inv. Kenrick informed the officers the driver of the white BMW was known as Diablo and was the subject of a drug investigation. He also informed the officers Diablo was known to carry weapons and was a cocaine user. Inv. Kenrick and other investigative agents arrived on scene shortly after the stop was safely executed.

Law enforcement had reliable information not only from the CI but also from at least five additional sources. The evidence will show the CI had been providing information for several months. Previous information he/she provided had been corroborated by other sources, including particular events. All the sources informed law enforcement that Diablo kept his real identity unknown to them. He brought controlled substances, primarily large quantities of methamphetamine but also heroin and small amount of cocaine, to Rapid City from Denver. Many of the sources implicated each other as being involved in the controlled substance conspiracy with the defendant. Additionally, almost all of the sources and CI were at some time leading up to the defendant's arrest, found by law enforcement with controlled substances.

Additionally, the CI's information was independently corroborated by Inv. Kenrick's viewing of the vehicle matching the CI's description and the driver. This occurred in the same geographic area where the defendant told the CI he would meet him/her. Multiple sources had described to Inv. Kenrick what "Diablo" looked like – a white male in at least his late 30's with sleeve tattoos and blondish brown hair. Several sources described Diablo as looking like an older

version of Inv. Kenrick.  When Inv. Kenrick saw the driver of the white BMW, the drive matched these descriptions of Diablo.  Furthermore, a photo of the driver/defendant was sent to the CI and another SOI who each independently confirmed the driver/defendant was in fact the individual they knew as Diablo.

The reliability of the CI's information is further corroborated by the defendant himself.  In *Rowe*, the defendant/driver informed law enforcement he was driving the owner's vehicle from Arizona to Minnesota, which is what the informant had previously told law enforcement.  878 F.3d at 626. Here, the CI had previously described the defendant as being armed and the defendant was in fact armed when he was pulled over.

In *Rowe*, the Eighth Circuit addressed a similar factual circumstance. 878 F.3d at 629.  There, a single CI who had previously provided accurate, timely, and verifiable information for years told law enforcement that Houston Oliver was sending a shipment of cocaine via priority mail from Arizona to Minneapolis. *Id.* He described the box and it was successfully intercepted. *Id.* at 627. The CI implicated three individuals involved in the shipment. *Id.* The CI also reported Oliver was going to transport a large quantity of cocaine from Arizona to Minnesota in a gray BMW with Minnesota license plates on November 30 but did not know the identity of the driver. *Id.*  The vehicle ownership was verified through records. *Id.* Law enforcement arranged for a state trooper to stop the vehicle. *Id.*  The Eighth Circuit held that given "the collective knowledge of the investigating officers, including the corroborated CI tips both previously and

ongoing, the alert, and the request by officers for [the trooper] to stop the identified vehicle, the stop itself was supported by probable cause." *Id.* at 629.

The defendant attempts to argue perceived inconsistencies from the summary of the sources' statements as outlined in the affidavit in support of the criminal complaint.[3] There are several problems with this approach. First, the affidavit is a summary amounting to probable cause, not a comprehensive overview of the entire investigation. Second, the affiant for the affidavit was not Inv. Kenrick, who is the primary investigator of the case. Finally, it does not account for information known to Inv. Kenrick on August 28 that led to the probable cause determination for the stop, which will be further borne out at the hearing. Evidence will be presented that the purpose of the defendant wanting to meet the CI was to collect money from him/her owed as part of a drug debt.

Alternatively, the stop can be justified as an investigatory stop based on reasonable suspicion the defendant was engaged in criminal activity – collecting a drug debt for controlled substances he had previously fronted to the CI. Such activity supports a drug conspiracy. "An investigatory stop does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Baldenegro-Valdez*, 703 F.3d 1117, 1125 (8th Cir. 2013). In *Baldenegro-Valdez*, police had observed the same car with the defendant as an occupant involved in a controlled buy earlier the same day and the car was peripherally involved in a second controlled

---

3. The defendant repeatedly references the Indictment, but the document being referenced is actually the affidavit in support of the federal criminal complaint sworn to and filed on August 30, 2017, by ATF SA Joseph Korth.

buy that day. *Id.* Here, as explained above, law enforcement had reasonable suspicion the defendant was pursuing efforts to collect money owed to him as part of a drug distribution conspiracy and was thus engaged in criminal activity.

**B.      Lawful Seizure of Firearm**

The evidence will show the RCPD officers were informed by Inv. Kenrick that the defendant was, according to source-derived information, known to be armed. Upon exiting his vehicle as directed, the defendant immediately informed the officers he was carrying a pistol in his waistband. During an investigatory stop, officers "may take steps reasonably necessary to protect their personal safety." *United States v. Stachowiak,* 521 F.3d 852, 855 (8th Cir. 2008) (quoting *United States v. Shranklen,* 315 F.3d 959, 961 (8th Cir. 2003)). "The critical inquiry is 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *United States v. Roggeman,* 279 F.3d 573, 578 (8th Cir. 2002)). Here, the officers' safety included initially taking the handgun from the defendant during the interaction based on the information provided to them by Inv. Kenrick and the defendant's own statement indicating he was armed. Thus, the officers lawfully came into possession of the firearm merely as a lawful safety measure.

In South Dakota, a holder of a concealed weapon permit "may carry a concealed pistol anywhere in South Dakota[.]" subject to some restrictions. SDCL § 23-7-8.1. A concealed firearm is defined as "any firearm that is totally hidden from view. If any part of the firearm is capable of being seen, it is not concealed[.]" SDCL § 22-1-2(6). Exhibits 1 and 2 show the defendant was

wearing an untucked t-shirt and jeans. As he is facing away from the officers, no part of the firearm he had placed in his back waistband was visible. He was therefore carrying a concealed firearm.

Pursuant to SDCL § 22-14-9, "[a]ny person . . . who (1) carries a pistol or revolver, loaded or unloaded, concealed on or about his or her person *without a permit* as provided in chapter 23-7 . . . is guilty of a Class 1 misdemeanor." (Emphasis added.) Because the firearm was identified to the officers by the defendant as being in a concealed location, that triggered a necessary step for the officers to determine whether the defendant was lawfully carrying a concealed firearm. Under SDCL § 23-7-8.6, "no state agency, political subdivision, official, agent, or employee of any state agency or political subdivision may knowingly keep or cause to be kept . . . any list, record, or registry of holders of permits to carry a concealed pistol." Therefore, without an individual either providing the permit to law enforcement or answering a question about having a permit, there is no expedient way for law enforcement to determine if an individual is lawfully carrying a concealed weapon.

After Ofc. Senesac retrieved the firearm, the defendant claims to have invoked his rights under *Miranda*, even though the officers had not yet formally advised him of those rights. The defendant argues Ofc. Raetz's question to him about having a concealed carry permit was asked in violation of *Miranda.* The requirements of *Miranda* are triggered only when a suspect is both in custody and being interrogated. *See United States v. Giboney*, 863 F.3d 1022, 1027 (8th

Cir. 2017). The defendant was neither in custody, nor interrogated by the RCPD officers.[4]

"Custody occurs when a suspect is deprived of his freedom of action in any significant manner." *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002). The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. LeBrun,* 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*)). The Eighth Circuit has set forth six non-exhaustive factors to inform the analysis, though cautioned they need not be applied ritualistically in every case. *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017). Those factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; [and] (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. . . . (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.*

The defendant was not in custody. The majority of the factors support this conclusion. Under the first factor, the defendant had not yet been arrested but

---

4. The defendant made no other statements other than those contained on the dash camera video to Ofc. Raetz.

was placed in handcuffs as "a reasonable response to the situation in order to protect the officers' personal safety and to maintain the status quo." *United States v. Martinez*, 462 F.3d 903, 907 (8ht Cir. 2006). The defendant voluntarily acquiesced to the limited questions Ofc. Raetz asked. No strong arm tactics or deceptive stratagems were employed. Finally, the atmosphere was not police dominated, in that it was a public parking lot as opposed to a formal interview room.

Also, the defendant was not interrogated. "Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2015) (*quoting United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004)). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Jackson*, 852 F.3d 764, 771 (8th Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682 (1980)). Not every question by a law enforcement officer to a citizen is interrogation. Ofc. Raetz was not expressly questioning the defendant in a way that was reasonably likely to elicit an incriminating response. Ofc. Raetz had looked, with the defendant's consent, through the wad of the defendant's money and credit cards.[5] He then asked, "Is your concealed carry permit in there with

---

5. A pat-down or "protective frisk" for officer safety is lawful when "specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." *United States v. Binion,* 570 F.3d 1034, 1039 (8th Cir. 2009) (quoting *United States v. Ellis,* 501 F.3d 958, 961 (8th Cir. 2007)).

it?"  This phrasing indicates he could have anticipated receiving a positive, non-incriminatory response to a routine question.  When the defendant answered "no," Ofc. Raetz then asked, "Do you have a concealed carry permit?"  The defendant answered "no."  Although Ofc. Raetz had been informed by Inv. Kenrick the defendant was likely armed, he had no information that the defendant was *unlawfully* armed, i.e. carrying a concealed weapon without a permit.

"The Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.' "  *United States v. Rodriguez–Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138 (1984)).  "In *Berkemer*, the Court held that a driver was not 'taken into custody' for *Miranda* purposes during a roadside stop until the police officer arrested him."  *United States v. Rodriguez*, 711 F.3d 928, 935 (8th Cir. 2013) (quoting *Berkemer*, 468 U.S. at 442, 104 S. Ct. 3138).  Accordingly, the Eighth Circuit had ruled, "courts should look for the 'functional equivalent of formal arrest' when considering whether *Miranda* applies to a traffic stop."  *Id.*

In *Rodriguez*, an officer asked the suspect to step out of a vehicle because he believed the suspect might be dangerous.  The officer also had noted "the suspicious nature of the car and a possible outstanding felony warrant," but also had seen the suspect reaching around the car and looking back at him.  *Id.*  After

the suspect told the officer he had a handgun in the vehicle, the officer handcuffed the suspect, but told him that he was not under arrest. *Id.* The Eighth Circuit concluded the suspect was not in custody for *Miranda* purposes: "Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop." *Id.* (quoting *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992). The court held, "asking a driver to exit the car was not the 'functional equivalent of formal arrest,' see *Berkemer*, 468 U.S. at 442, 104 S. Ct. 3138, because [the officer] was temporarily detaining [the suspect] to investigate [his] identity and a potential arrest warrant . . . ." *Id.* Accordingly, the court held the district court had correctly denied the defense motion to suppress.

Even if the question by Ofc. Raetz about whether the defendant had a concealed carry permit was in violation of *Miranda*, it was inevitable the officers would find through investigation that the defendant did not have a valid concealed carry permit.[6] After observing the defendant with the handgun in a concealed location, the officers were required to investigate whether he was allowed to do so. If Ofc. Raetz had not asked the defendant whether he had a permit or if the defendant had not answered, it would not change the outcome

---

6. The Supreme Court, in *United States v. Patane*, 542 U.S. 630, 636, 124 S. Ct. 2620 (2004), held that a statement obtained in violation of *Miranda* does not automatically require suppression of any evidence gathered because of the statement if the statement was voluntary. Even if there was a *Miranda* violation in this case, there is no indication the defendant's statement regarding not having a concealed carry permit was not voluntary.

of the violation. Law enforcement still would have taken investigatory steps to determine if the defendant did in fact have such a permit. They would have found he did not and would then have charged him. Until they determined an answer on the permit issue, the defendant could have been detained pending investigation.

Finally, even if the defendant *had* a concealed carry permit, he still would have been in possession of a stolen firearm. As established earlier, Ofc. Senesac lawfully took possession of the firearm from the defendant. The firearm's serial number is clearly located on the outside and can be observed without any manipulation of any of the pieces. Ofc. Raetz requested dispatch run the serial number through records and it came back as having been reported stolen in Rapid City in May 2017. Thus, the defendant was in violation of the law.

## C.     Vehicle Search

### 1. Inventory Search

"Law enforcement officers may conduct a warrantless search when taking custody of a vehicle to inventory the vehicle's contents 'in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger.'" *United States v. Ball*, 804 F.3d 1238, 1240-41 (8th Cir. 2015) (quoting *United States v. Hartje,* 251 F.3d 771, 775 (8th Cir. 2001)). Furthermore, although "officers 'may not raise the inventory-search banner in an after-the-fact attempt to justify what was . . . purely and simply a search for incriminating evidence,' they are permitted to 'keep their eyes open for potentially incriminating items that they might discover

in the course of an inventory search, as long as their sole purpose is not to investigate a crime.'" *Ball*, 804 F.3d at 1241 (quoting *United States v. Beal,* 430 F.3d 950, 954 (8th Cir. 2005)).  An inventory search "must be reasonable in light of the totality of the circumstances." *Beal*, 430 F.3d at 954.

Here, the on-scene uniformed officers conferred with each other.  Based on the defendant's unpermitted, concealed possession of a stolen firearm, he was under arrest and going to jail.  Given that and the fact that the defendant was the sole occupant of his vehicle, they decided to conduct an on-scene inventory search of the vehicle before it was towed.  This is permissible and legal.

### 2. Probable Cause

In addition to the inventory search, law enforcement also had probable cause to search the defendant's vehicle under the automobile exception.  "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005) (additional citations omitted); *see also United States v. Rodriguez,* 414 F.3d 837, 843 (8th Cir. 2005). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 1141 (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983); *United States v. Gleich*, 397 F.3d 608, 612–13 (8th Cir. 2005)).  "In determining whether an officer had probable cause to

search, courts apply a common sense approach and consider all relevant circumstances." *Id.* (citing *Gleich*, 397 F.3d at 612).

At the time they were beginning the search, law enforcement had already retrieved from the defendant's person a stolen firearm and two cell phones. There could reasonably have been evidence related to the firearm possession and its potential theft by the defendant in the vehicle. "An investigatory motive does not render an inventory search invalid unless that motive is the officers' sole motivation in carrying out the search." *United States v. Evans*, 781 F.3d 433, 437 (8th Cir. 2015). There is no support that an investigatory motive was the sole motivation for the search of the vehicle.

The probable cause to search the vehicle is reinforced by the probable cause information supporting the stop, specifically the information known to Inv. Kenrick provided by the CI, all as described above. To support a probable cause determination, officers may rely on an informant's tip if the informant has provided reliable information in the past or if his tip is independently corroborated. *United States v. Hambrick*, 630 F.3d 742, 747 (8th Cir. 2011) (additional citations omitted). For the same reasons as supporting the stop and the information provided by the CI that the defendant wanted to meet him to collect money owed for a drug debt, there was probable cause to search the vehicle.

Based on the defendant's possession of a concealed and stolen firearm, as well as the information known to Inv. Kenrick and the UNET officers, probable cause was established to search the defendant's vehicle. "Probable cause may be

based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Shackleford*, 830 F.3d 751, 753–54 (8th Cir. 2016) (citing *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003) (quotation omitted), *cert. denied*, 541 U.S. 1081, 124 S. Ct. 2435 (2004)).

## CONCLUSION

The United States respectfully requests this Court deny the defendant's motion to suppress. The United States requests permission to provide supplemental briefing to the Court after an evidentiary hearing.

Dated this 20th day of February, 2018.

RONALD A. PARSONS, JR.
United States Attorney

*/s/ Kathryn N. Rich*

_____
Kathryn N. Rich
Assistant United States Attorney
515 Ninth Street, Suite 201
Rapid City, SD 57701
Email: Kathryn.Rich@usdoj.gov