UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    vs.<br><br>DANA FAULKNER,<br><br>              Defendant. | 5:17-CR-50144-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 38).  A hearing was held on Tuesday, May 1, 2018.  Defendant was personally present and represented by his attorney of record, John Fitzgerald.  The Government was represented by the Assistant United States Attorney Kathryn Rich.  Three witnesses testified at the hearing.  Nine exhibits were received into evidence. (Doc. 65).  Both parties have submitted briefs, and post-hearing supplemental briefing was concluded on July 26, 2018.  Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

### **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress Evidence be denied.

## JURISDICTION

Defendant is charged in an Indictment with Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) & (C); Use of Firearm in Furtherance of Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and Prohibited Person in Possession of Firearm, in violation of 18 U.S.C. § 922(g)(1).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

Pennington County Sheriff's Investigator ("Inv.") Casey Kenrick and Rapid City Police Department Officers Nathanial Senesac and Daniel Raetz testified at the May 1, 2018 evidentiary hearing.  At all times relevant to Defendant's suppression motion, Inv. Kenrick served as an investigator with the Unified Narcotics Enforcement Team ("UNET"), a drug investigation team made up of multiple Western South Dakota law enforcement agencies.  (Doc. 67 at p. 2–3).  The court finds Inv. Kenrick, Officer Senesac, and Officer Raetz to be credible witnesses.

### The Investigation: May-Early August 2017

In approximately May of 2017, Inv. Kenrick began receiving information about an individual from the Colorado area known only as "Diablo."  (Id. at p. 4).  Multiple sources of information ("SOIs") advised Inv. Kenrick that Diablo was distributing large amounts of methamphetamine, cocaine, and heroin in Rapid City, South Dakota.  (Id. at p. 4).  UNET began investigating Diablo.

2

Throughout the investigation, Inv. Kenrick and other law enforcement members personally interviewed seven SOIs about Diablo's drug distribution in the Rapid City area. (See id. at p. 5, 10–11, 13, 16, 20, 23). Those SOIs are identified as SOI #1–SOI #7. (Id.).

### A.    SOI #1

Inv. Kenrick came into contact with SOI #1 in May 2017, when he conducted a controlled purchase of methamphetamine and heroin. (Id. at p. 5). Following the controlled purchase, SOI #1 acknowledged distributing methamphetamine and heroin, and admitted involvement with Jade Dugan (5:17-cr-50174-JLV-1)[1] and SOI #6. SOI #1 additionally identified SOI #2, SOI #3, SOI #4, and SOI #7 as being involved with Diablo and selling pounds of meth and/or heroin for Diablo. (Id. at p. 8–10). SOI #1 stated that Diablo's drug operation would transport meth from Colorado to Rapid City in spare tires. (Id. at p. 7–8). He provided a physical description of Diablo: "white, medium build, long beard; somewhere in his 30s and from Colorado." (Id. at p. 7).

SOI #1 also discussed his own involvement with Diablo with Inv. Kenrick, stating that he owed a $25,000 drug debt to Diablo and feared for his own life and his family's safety. (Id.). SOI #1 described an incident that led to his incarceration in the Meade County jail: SOI #2 took SOI #1 to rural Meade County under the guise of picking up a car, but when they arrived at their

---

[1]    On April 16, 2018, Jade Dugan pleaded guilty to Count I of the Indictment in her case, which charges her with Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).

destination SOI #1 saw Diablo sitting in a car waiting for him.  (Id. at p. 8).
Fearing for his life, SOI #1 took off running and called 911; law enforcement
arrived and arrested him because he had illegal drugs in his pocket.  (Id.).

### B.    SOI #2

During the investigation, Inv. Kenrick compiled information on SOI #2;
on August 2, 2018, he executed a search warrant on SOI #2's hotel room in the
Rapid City Baymont Inn.  (Id. at p. 11–12).  The hotel room search revealed
cocaine, meth, opioid paraphernalia, and a firearm.  (Id. at p. 12).  After the
search, Inv. Kenrick interviewed SOI #2, who admitted to selling heroin, meth,
and cocaine for Diablo in half-pound quantities, and said he knew Diablo
frequently carried firearms.  (Id.).  SOI #2 also corroborated SOI #1's story
about the Meade County incident: Diablo told SOI #2 he was "on the hook" for
assisting SOI #1, and thus forced SOI #2 to bring SOI #1 to him "as payment
for the debt."  (Id.).  SOI #2 then described the same series of events that SOI
#1 did.  (Id. at p. 13).  SOI #2 is married to an individual known as SOI #5; he
said SOI #5 overdosed on heroin that Diablo provided her.  (Id. at p. 13).  As
the investigation progressed, Inv. Kenrick considered SOI #2 as a potential
confidential informant, and initiated the paperwork process.  (Id. at p. 27).  Inv.
Kenrick ultimately did not complete the process because SOI #2 was no longer
needed as an informant.  (Id. at p. 28).

### C.    SOI #5

When SOI #5 was interviewed, she confirmed that she overdosed on
heroin in July of 2017.  (Id. at p. 14).  She stated she was aware that her

husband—SOI #2—was receiving drugs from Diablo.  (<u>Id.</u>).  She described

Diablo as "white, shorter, with a big beard, scruffy and stocky."  (<u>Id.</u>).

### D.    SOI #7

In July of 2017, an individual at the Pennington County Jail requested to

speak with UNET.  (<u>Id.</u> at p. 9).  This individual became known as SOI #7; he

was incarcerated on an unrelated crime.  (<u>Id.</u> at p. 10).  SOI #7 named SOI #1,

SOI #3, and SOI #4 as all being involved with Diablo and mentioned obtaining

meth from all three of those SOIs.  (<u>Id.</u>).  Inv. Kenrick testified that law

enforcement already independently knew the information SOI #7 described,

and SOI #7's statements corroborated that information.  (<u>Id.</u> at p. 10–11).

### The Investigation: August 2017

At this point in the investigation, Inv. Kenrick only knew Diablo's

physical description and nickname.  (<u>Id.</u> at p. 14).  UNET obtained phone

numbers that possibly belonged to Diablo, but those numbers frequently

changed.  (<u>Id.</u> at p. 15).  Inv. Kenrick became increasingly concerned as he

received information on guns, threats of violence, and quasi-kidnapping.  (<u>Id.</u> at

p. 25).  He stated it was also concerning that UNET still had not obtained an

identification—this, he said, is uncommon in typical drug investigations.  (<u>Id.</u>).

In late July through August, Inv. Kenrick began using a pen register in the

hopes of obtaining an identification.  (<u>Id.</u>).  Inv. Kenrick also briefed the patrol

divisions of the Pennington County Sheriff's Office, Rapid City Police

Department, and Highway Patrol multiple different times.  (<u>Id.</u> at p. 25–26).  In

those briefings, Inv. Kenrick provided descriptions of Diablo and his vehicles,

and instructed patrol that if they had any contact with anyone potentially fitting those descriptions, they were to call Inv. Kenrick.  (Id.).

**E.    SOI #3**

In August of 2017, SOI #2 informed law enforcement that he was supposed to pick up a vehicle belonging to SOI #3.  (Id. at p. 16).  SOI #3 was in jail at that time for unrelated issues, and had left the vehicle at another individual's house.  (Id.)  Law enforcement located and searched SOI #3's vehicle, finding a handgun, scales, meth, heroin, cocaine, baggies, nearly $16,000 in cash, and a Pennington County Sheriff's Office badge.  (Id. at p. 17).  Inv. Kenrick then interviewed SOI #3, who admitted involvement with Diablo.  (Id.).  SOI #3 stated he was afraid of Diablo, and owed him a $150,000 drug debt.  (Id. at p. 17–18).  SOI #3 admitted ownership of the items in the vehicle, and stated the money was supposed to go to Diablo to account for his drug debt.  (Id.).

In a second interview, SOI #3 described Diablo as looking like Inv. Kenrick, "with a bigger beard, thinner face, sleeve tattoos, white, and blondish-brown hair."  (Id. at p. 19).[2]  SOI #3 stated he met Diablo through Jade Dugan, and outlined how he would receive drugs from Diablo: Diablo himself would bring the drugs up from the Colorado area in rental cars, and then SOI #3 would meet him at different locations throughout Rapid City.  (Id. at p. 19–20).

---

[2]    Inv. Kenrick testified that a number of SOIs described Diablo as looking similar in appearance to Inv. Kenrick.  (Doc. 67 at p. 19).  Inv. Kenrick testified that his appearance during the evidentiary hearing was different than it was during August of 2017, in that he cut his hair short and shaved off his large beard.  In reviewing the arrest video of August 28, 2017, the appearance of the defendant and the appearance of Inv. Kenrick are remarkably similar. See Ex. 1 at 15:59 (arrest of defendant); 16:12:10 & 16:17:54 (Inv. Kenrick on-screen).

He estimated receiving a total of 19 pounds of meth from Diablo.  (Id. at p. 20).
SOI #3 said he knew SOI #4 and SOI #2 also worked as dealers for Diablo.
(Id.).

### F.    SOI #4

In early to mid-August, Inv. Kenrick interviewed SOI #4 in county jail.
(Id. at p. 20–21).  SOI #4 described his involvement with Diablo leading up to
his arrest: he did not know Diablo's real name, but was aware that Diablo
sometimes stayed with Jade Dugan and Braden Storms (5:17-cr-50174-JLV-3),
and knew Diablo was bringing drugs from the Colorado area.  (Id. at p. 21–22).
SOI #4 provided Dugan and Storms' address, which corroborated the address
Inv. Kenrick obtained from other individuals.  (Id.).  SOI #4 stated Diablo
fronted him three to four pounds of meth.  (Id. at p. 22).  SOI #4 told Inv.
Kenrick that he knew SOI #1, SOI #2, SOI #3, and SOI #6 all sold drugs for
Diablo; further, he knew SOI #3 owed a $150,000 drug debt to Diablo,
corroborating SOI #3's own statements.  (Id.).

### G.    SOI #6

Inv. Kenrick interviewed SOI #6 at the Pennington County Jail.  (Id. at p.
23).  She discussed meeting Diablo through SOI #1, and said she knew SOI #2,
SOI #3, and SOI #4 also dealt drugs for Diablo.  (Id. at p. 23–24).  She believed
Diablo transported drugs in rental cars from Colorado to South Dakota, and
she had seen him with several firearms.  (Id. at p. 24).  She also described
Jade Dugan's arrest, and provided the same address for Dugan and Storms'
residence as other SOIs.  (Id. at p. 24–25).  Like SOI #3, SOI #6 described

Diablo's appearance as being similar to Inv. Kenrick: big beard, white, short, and sleeve tattoos.  (Id. at p. 25).

### The Arrest

Around August 7, 2017, SOI #2 informed law enforcement that Diablo was going to "take three people out of the equation."  (Id. at p. 79).  SOI #2 then learned Diablo wanted to kill him, and he informed Inv. Kenrick of the same. (Id. at p. 81).  On August 28, 2017, Inv. Kenrick received a number of phone calls and texts messages from SOI #2 and SOI #5.  (Id. at p. 28–29).  The SOIs told Inv. Kenrick that Diablo was in Rapid City, and wanted to meet up with the two SOIs around Lombardy Drive and Creek Drive in Rapid City so they could repay a drug debt.  (Id.).  SOI #5 texted Inv. Kenrick a Google Maps screenshot of Diablo's location.  (Ex. 6).  SOI #2 called Inv. Kenrick and kept him updated over the phone; Inv. Kenrick told SOI #2 to not meet up with Diablo, but instead to drive by and try to identify what vehicle Diablo was in. (Doc. 67 at p. 34–35).  Inv. Kenrick also notified Rapid City Police Department ("RCPD") Officer Daniel Raetz that Diablo was in the vicinity, believed to be armed and potentially trafficking drugs, and was known to be violent or at least to make threats of violence.  (Id. at p. 41).  Officer Raetz conveyed this information to RCPD Officer Nathanial Senesac.  (Id. at p. 140–41).

Inv. Kenrick and another investigator set up on the far south entrance to Lombardy Drive, which is a short U-shaped street connecting to Creek Drive. (Id. at p. 35).  Inv. Kenrick also assembled other UNET agents in unmarked cars around the area, and patrol vehicles ready to perform a traffic stop.  (Id. at

p. 37).  SOI #2 called Inv. Kenrick and told him he spotted Diablo in a white BMW with Colorado license plates; almost contemporaneously, a white BMW with Colorado plates drove right past Inv. Kenrick on Lombardy Drive.  (Id. at p. 34–35).  Inv. Kenrick was able to see the individual in the vehicle, who matched the SOIs' descriptions of Diablo.  (Id.).  As soon as Inv. Kenrick spotted the BMW, he notified the patrol units and instructed them to stop the vehicle.  (Id. at p. 37).[3]

RCPD Officer Daniel Raetz testified that on August 28, 2018, Inv. Kenrick contacted him and advised that RCPD was to make a traffic stop on a UNET suspect.  (Id. at p. 139–40).  Inv. Kenrick advised Officer Raetz that the suspect, Diablo, was the subject of a drug investigation, and told him where to assemble.  (Id. at p. 140).  Inv. Kenrick also advised Officer Raetz that Diablo was known to be armed, had a cocaine habit, and provided a physical description.  (Id. at p. 141–42).  Officer Raetz testified that he was aware of the Diablo investigation; UNET had previously briefed patrol, and Officer Raetz had discussed Diablo with other officers around the police department.  (Id. at p. 141).

After spotting Diablo, Inv. Kenrick then called Officer Raetz again with the description of the white BMW bearing Colorado license plates, said the

---

[3]      Inv. Kenrick explained that, for safety and effectiveness, the marked patrol units should conduct such a traffic stop instead of unmarked, plainclothes agents like himself.  (Doc. 67 at p. 39–40; 143).  Inv. Kenrick further testified that he typically drives past the location of the stop to monitor it and parks nearby, but for safety reasons, he does not initially intervene until the situation is completely under control.  (Id. at p. 41–42).  He did so here after Officers Raetz and Senesac initiated the stop, and did not approach the scene until the situation calmed down.  (Id. at p. 42).

BMW was turning east from Campbell Street onto St. Joseph Street, and stated Diablo was driving the vehicle.  (Id. at p. 140).  Inv. Kenrick asked Officer Raetz and Officer Nathanial Senesac to conduct a traffic stop of the BMW.  Officer Senesac testified that he had received information about the Diablo investigation at a prior UNET briefing.  (Id. at p. 107).  Officers Raetz and Senesac spotted the BMW and pulled it over.  (Id. at p. 142).

After pulling the BMW over, Officer Raetz instructed Diablo to exit the vehicle.  (Id. at p. 146).  Diablo complied, and gestured indicating he had a concealed firearm in his waistband.  (Id. at p. 147; Ex. 1 at 15:59).  Officer Raetz instructed Diablo to move away from the vehicle and get down on the ground, and Officer Senesac approached Diablo and handcuffed him.  (Id. at p. 110–12; Ex. 1 at 16:00).  Officer Senesac testified that it is standard protocol to handcuff potentially dangerous, armed suspects for officer safety.  (Doc. 67 at p. 112).  The officers recovered the firearm from Diablo's waistband.  (Id. at p. 112).

Officer Raetz walked Diablo to the patrol vehicle.  (Ex. 1 at 16:01).  While walking to the vehicle, Diablo asked Officer Raetz what he was charged with, and Officer Raetz responded "All in due time—I'm just a pawn at this point." (Id.).  Diablo then said he would like to have his attorney present, and Officer Raetz said "I'll be sure not to ask you anything."  (Id.).  Officer Raetz then asked for consent to look through a wad of cash, cards, and ID that Diablo had on his person, and Diablo consented.  (Id.; Doc. 67 at p. 151–52).  The ID cards showed that Diablo's true name is Dana Faulkner.  Mr. Faulkner again

requested to have an attorney on-scene and Officer Raetz responded "We don't call any attorneys or anything like that." (Ex. 1 at 16:02:10). Officer Senesac testified that RCPD standard protocol dictates asking an individual with a concealed weapon if he has his concealed-carry permit on him; if he does not, then the officer asks if the individual has a permit at all. (Doc. 67 at p. 117). Officer Raetz asked Mr. Faulkner if his concealed-carry permit was in his bundle of identifying documents. (Ex. 2 at 16:04:00; Doc. 67 at p. 154–55). Mr. Faulkner responded "no." Officer Raetz asked, "Do you have a concealed-carry permit?" Mr. Faulkner again answered "no." Officer Raetz stated "You do not have a concealed-carry permit." (Ex. 2 at 16:04:00–05).

Officer Senesac requested an NCIC check on Mr. Faulkner's firearm. (Doc. 67 at p. 114; Ex. 2 at 16:05:20–40). Officer Senesac testified that the firearm's serial number was easily visible, and he did not have to manipulate the weapon in any way to see the number. (Doc. 67 at p. 114–15). NCIC reported that the firearm was stolen. (Id. at p. 116). Possession of a stolen firearm is a felony charge, requiring the offender to be taken into custody. (Id. at p. 117). Further, RCPD standard procedure is to take someone to jail for carrying a weapon without a concealed-carry permit. (Id.).

After Officers Senesac and Raetz secured Mr. Faulkner in the patrol vehicle, Inv. Kenrick came to the scene along with several other agents. (Id. at p. 54). Mr. Faulkner refused to talk about the BMW, and law enforcement had no information on the rightful owner of the vehicle. (Id. at p. 59–60). Law enforcement determined that Mr. Faulkner would be arrested for possessing

11

the stolen firearm and for not having a concealed-carry permit; no one else was available to remove the BMW. (Id. at p. 161–62). Under these circumstances, protocol dictated conducing an inventory search of the vehicle and then towing it. (Id.). The agents conducted an inventory search of the BMW and located various items including two glass pipes, a black ledger notebook, pills, several grams of methamphetamine, a vape pen with methamphetamine oil, a small amount of Colombian pesos, and a car title in the name of Felipe S Hernandez Diaz. (Ex. 3, 5). Officer Senesac transported Mr. Faulkner to the Pennington County Jail. (Ex. 2 at 16:18). Officer Senesac took a photo of Mr. Faulkner at Inv. Kenrick's request; Inv. Kenrick then sent the photo to SOIs 2 and 3, who both verified that Mr. Faulkner is indeed Diablo. (Doc. 67 at p. 61).

## DISCUSSION

Mr. Faulkner moves to suppress his statements and all physical evidence obtained during the stop and arrest on August 28, 2018. (Doc. 38). In support, Mr. Faulkner argues that the investigation leading up to his arrest was untrustworthy and unsupported by any corroborating information; SOI #2's tip to Inv. Kenrick regarding Mr. Faulkner's location was unreliable and insufficiently predictive; Mr. Faulkner was stopped and arrested without probable cause, because Officers Raetz and Senesac did not possess sufficient information to arrest him at the time of the stop; Officer Raetz's question about the concealed-carry permit violated Mr. Faulkner's Miranda rights; Officer Senesac illegally seized Mr. Faulkner's firearm, and conducted an illegal search

by observing and reporting the firearm's serial number; and law enforcement illegally searched the BMW.  (Docs. 38, 74).

## I.    Law Enforcement Performed a Proper <u>Terry</u> Stop

Motor vehicles and their occupants are subject to investigative <u>Terry</u> stops.  <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968); <u>see</u> <u>Alabama v. White</u>, 496 U.S. 325, 327–329 (1990); <u>United States v. Hernandez–Hernandez</u>, 327 F.3d 703, 706 (8th Cir. 2003); <u>United States v. Quarles</u>, 955 F.2d 498, 501 (8th Cir 1992).  "An investigative stop does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity."  <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999).  "[An] officer's suspicion is reasonable if the officer knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed."  <u>Hernandez-Hernandez</u>, 327 F.3d at 706 (citing <u>Terry</u>, 392 U.S. at 21–22).  "There is no requirement that there be a traffic violation" to conduct a <u>Terry</u> stop.  <u>United States v. Mora-Higuera</u>, 269 F.3d 905, 909 (8th Cir. 2001); <u>White</u>, 496 U.S. at 327–29 (upholding stop in absence of traffic violation).

"Reasonable suspicion can arise from an informant's tip 'that is less reliable than that required to show probable cause.'"  <u>Bell</u>, 183 F.3d at 749 (quoting <u>White</u>, 496 U.S. at 330) (finding reasonable suspicion to stop drug trafficking suspect's vehicle where a source of information called police and described the vehicle and license plate number); <u>United States v. Jacobsen</u>, 391 F.3d 904, 906 (8th Cir. 2004) (finding reasonable suspicion for <u>Terry</u> stop where narcotics detectives received calls from informant describing suspect's

location and vehicle).   The word of an unproven informant may nevertheless be

sufficient to support reasonable suspicion if the informant's tip is corroborated.

White, 496 U.S. at 330.  "Though less reliable than informants with a proven

record, unproven informants are more reliable than anonymous tipsters

because the police can hold them responsible for false information."  United

States v. Kent, 531 F.3d 642, 648 (8th Cir. 2008).

"In deciding whether to conduct a Terry stop, an officer may rely on

information provided by other officers as well as any information known to the

team of officers conducting the investigation."  United States v. Thomas, 249

F.3d 725, 728 (8th Cir. 2001) (internal citation omitted).  The officers

performing the Terry stop need not themselves know the specific facts

prompting the stop.  Jacobsen, 391 F.3d at 905–06.   Rather, the officers "need

only rely upon an order that is founded on reasonable suspicion."  Id. at 907.

Specifically,

> if a flyer or bulletin has been issued on the basis of articulable facts
> supporting a reasonable suspicion that the wanted person has
> committed an offense, then reliance on that flyer or bulletin justifies
> a stop to check identification, to pose questions to the person, or to
> detain the person briefly while attempting to obtain further
> information.

Id.  (quoting United States v. Hensley, 469 U.S. 221, 232 (1985)) (holding that a

wanted bulletin is analogous to one officer directing another to pull over a

vehicle).  There need only be "some degree of communication" between the

officers possessing the specific knowledge and those performing the stop.  Id.

(after informant described suspect's location and truck, narcotics detectives

described truck to patrol officer and instructed him to pull truck over; officer

was given no information about investigation, except that narcotics detectives needed help stopping truck; officer pulled truck over, told suspect false reason for stop, and detained suspect 10–15 minutes until detectives arrived; no Fourth Amendment violation occurred because minimal instructions to patrol officer constituted "some degree of communication").

Mr. Faulkner argues there was no probable cause to stop him.  As stated above, law enforcement only needed reasonable suspicion to conduct the Terry stop.  Further, the court rejects Mr. Faulkner's argument that the various SOIs' statements were insufficiently corroborated, and that SOI #2's tip was unreliable and insufficiently predictive.  At the evidentiary hearing, Inv. Kenrick detailed at length the four-month-long investigation, and the court finds that the SOIs corroborated each other on many key points, including a physical description of "Diablo."

On August 28, 2017, SOI #2 provided Inv. Kenrick with information that corroborated facts learned throughout the investigation: Mr. Faulkner was in Rapid City to collect a drug debt.  SOI #2 described Mr. Faulkner's vehicle, and Inv. Kenrick verified that the vehicle's occupant matched the physical description of Mr. Faulkner before requesting the stop.  The investigation provided law enforcement with sufficient particularized, objective facts leading to a rational inference that Mr. Faulkner was engaged in drug trafficking.

Next, Officers Raetz and Senesac were not required to know any particularized details about the investigation before conducting the stop.  See Jacobsen, 391 F.3d at 905–06.  Like in Jacobsen, Inv. Kenrick merely informed

15

Officers Raetz and Senesac that he needed them to stop Mr. Faulkner's vehicle in connection with an investigation. See id. In fact, Officers Raetz and Senesac knew more about the Diablo investigation than the patrol officer did in Jacobsen, as they had attended briefings or discussed the investigation with other officers. See id. The facts here therefore satisfy the requirement that there be "some degree of communication" between the officer possessing particularized knowledge and those performing the stop. Id.[4] Further, the officers were under no obligation to discuss the stop with Mr. Faulkner, or tell him the reason for the stop. Id. (finding no Fourth Amendment violation where patrol officer gave suspect false reason for the stop before detectives arrived). For these reasons, the Terry stop performed by Officers Raetz and Senesac did not violate the Fourth Amendment.

## II. Mr. Faulkner's Statements Were Not Obtained in Violation of Miranda

Mr. Faulkner argues his statement regarding a concealed-carry permit was elicited in violation of Miranda. The government responds that Mr. Faulkner was neither interrogated nor in custody when he made the statement, and therefore Miranda was not triggered.

---

[4]    Mr. Faulkner argues that United States v. McClelland, CR 17-40029-LLP, 2017 WL 5158682 (D.S.D. Nov. 6, 2017) created a higher standard than the Eighth Circuit's rule, and held that the officer conducting the stop must possess "articulable facts, supporting the reasonable suspicion." (Doc. 74 at p. 6, n.1). McClelland's holding is distinguishable on its facts, and does not control this case. There, the officer received information from fellow law enforcement that the defendant was potentially transporting contraband. The officer pulled defendant over for exceeding the speed limit, and deployed a drug dog. The court held that the information received from law enforcement did not on its own provide reasonable suspicion for the drug dog sniff, but the totality of the circumstances justified the sniff. Because the defendant was pulled over for a traffic violation, the court did not address the validity of the stop.

A criminal suspect in custody must be informed of his right to remain silent and to have counsel appointed before being interrogated.  Miranda v. Arizona, 384 U.S. 436, 472, 479 (1966)).  Miranda's protections only apply to a custodial interrogation.  Id.  Miranda warnings are not required simply because the questioning is conducted in a certain place, i.e., a patrol car, or because the person being questioned is suspected of having committed some offense.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  "In a routine traffic stop, detention of an individual is usually temporary and public."  United States v. Boucher, 909 F.2d 1270, 1174 (8th Cir. 1990).  The atmosphere of a traffic stop is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself."  Berkemer v. McCarty, 468 U.S. 420, 439 (1984).  For these reasons, the Supreme Court has held that "persons temporarily detained pursuant to [Terry] stops are not 'in custody' for the purpose of Miranda."  Id. at 440.

Although officers must use the "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the Terry stop," officers may also take any steps that are reasonably necessary to protect their safety and maintain the status quo.  United States v. Navarrete–Barron, 192 F.3d 786, 790 (8th Cir. 1999); see United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006).  "It is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and

17

protect their safety." United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004) (citations omitted); Navarrete–Barron, 192 F.3d at 791 (ordering defendant out of truck at gunpoint with hands in the air, handcuffing him, and placing him in squad car did not transform Terry stop into arrest, and was reasonable under circumstances where defendant was suspected of drug trafficking). The Eighth Circuit has also stated numerous times that officers may reasonably suspect that persons involved in drug transactions are armed. E.g., United States v. Newell, 596 F.3d 876, 880 (8th Cir. 2010) ( "While [officers] lacked specific information that Newell was armed, as discussed, dangerous weapons are often used by drug traffickers."); United States v. Ramires, 307 F.3d 713, 716 (8th Cir. 2002) (noting that "police were investigating drug activity, which frequently involves weapons"); Navarrete–Barron, 192 F.3d at 791 ("At the time of the stop, the officers had a reasonable suspicion that the occupants of the truck had been or were engaged in drug trafficking, which very often is accompanied by dangerous weapons.")

Because a person subject to a Terry stop is not "in custody," officers are generally not required to provide Miranda warnings before asking investigative questions. See, e.g., United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (holding that, although "[o]ne is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited questioning," this does not rise to the level of a custodial interrogation). Furthermore, a police officer's "unarticulated plan [to later arrest a suspect] has no bearing on the question whether a suspect was 'in custody' at a

particular time." Berkemer, 468 U.S. at 442; see United States v. Boucher, 909 F.2d 1270, 1175 (8th Cir. 1990) (although officer observed gun in defendant's truck and planned to arrest him, defendant was unaware of these facts, had no reason to believe he was suspected of anything other than speeding, and thus was not in custody for Miranda purposes when he made incriminating statements).

As stated above, Officers Raetz and Senesac lawfully stopped the BMW. The officers were then entitled to undertake measures to protect their personal safety.  The officers suspected Mr. Faulkner of trafficking drugs, and reasonably believed he could be armed.  Thus, the officers' actions in brandishing weapons, ordering Mr. Faulkner to get on the ground, and handcuffing him were reasonable safety measures, and—contrary to Mr. Faulkner's claims—did not transform the stop into an arrest.  Navarrete–Barron, 192 F.3d at 791.  After Officer Raetz discovered the firearm, he was permitted to inquire whether Mr. Faulkner had a concealed-carry permit.  See United States v. McClelland, CR 17-40029-LLP, 2017 WL 5158682, at *2 (D.S.D. Nov. 6, 2017) (officer permissibly asked defendant during traffic stop if he had anything illegal in the car); United States v. Travis, Cr. No. 14-253, 2015 WL 439393, at *2–3 (D. Minn. Feb. 3, 2015) (no Miranda violation where officer questioned defendant during traffic stop about marijuana smell, whether defendant had anything illegal on him, and whether baggie discovered during Terry frisk contained crack).  Because Mr. Faulkner was not in custody at the time he made the statement, no Miranda violation occurred; Mr. Faulkner's

19

request for an attorney did not in and of itself trigger <u>Miranda</u>'s requirements. <u>See</u> <u>McCarty</u>, 468 U.S. at 440.

## III.    The Firearm Seizure and Serial Number Inspection Were Valid

Mr. Faulkner argues that officers illegally seized the firearm, and then unlawfully obtained its serial number.  The government responds that the officers obtained the firearm as a lawful safety measure.  (Doc. 73 at p. 9).

Brief detention of a suspect during a <u>Terry</u> stop is permissible to investigate possible criminal activity, even though there is no probable cause for an arrest.  <u>Hernandez-Hernandez</u>, 327 F.3d at 706.  "If the officer also reasonably believes the person may be armed and dangerous, the officer may frisk the suspect for weapons."  <u>Id.</u>  (citing <u>Terry</u>, 392 U.S. at 24).  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  <u>Terry</u>, 392 U.S. at 27.  During a <u>Terry</u> frisk, if the officer feels an item he immediately recognizes as contraband, weapon, or incriminating evidence, he may seize that item. <u>United States v. Bustos-Torres</u>, 396 F.3d 935, 944–45 (8th Cir. 2005) (citing <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375–76 (1993)).

If the officer obtains lawful possession of firearms during a <u>Terry</u> stop and frisk, he is "free to take down [the firearms'] serial numbers."  <u>Watts</u>, 7 F.3d at 127 (citing <u>United States v. Wallace</u>, 889 F.2d 580, 583 (5th Cir. 1989) (stating that the police having "legally come into possession of the gun . . . were entitled, if not expected, to note and to record its serial number[.]")).  "Police

have an affirmative duty to utilize the least intrusive methods reasonably available to dispel their suspicions." Watts, 7 F.3d at 127 (internal citation omitted).  Checking a firearm's registration via the police radio is "a relatively quick, effective method of determining whether the [firearm] might be stolen." Id.  Further, because firearms obtained through a Terry stop and frisk are lawfully in the officer's possession, the Arizona v. Hicks[5] "plain view" analysis, "which involves the extent to which officers can manipulate items in their presence but not their possession, is inapplicable." Watts, 7 F.3d at 127 (holding officers' conduct in searching suspects' van during Terry stop, opening gun cases found in van, examining guns, and reporting guns' serial numbers did not violate Fourth Amendment); see also United States v. Lacey, 530 F.2d 821, 823 (8th Cir. 1976) (defendant had no right to privacy in currency serial numbers after agents lawfully discovered and took possession of currency).

Here, Officers Raetz and Senesac briefly detained Mr. Faulkner while conducting the Terry stop.  This brief detention was permissible.  Hernandez-Hernandez, 327 F.3d at 706.  Mr. Faulkner informed Officers Raetz and Senesac that he had a firearm in his waistband.  This information gave the officers a reasonable belief that Mr. Faulkner was indeed armed, allowing a Terry frisk for weapons.  See id.  Even if Mr. Faulkner had not indicated he had a weapon, Inv. Kenrick previously informed the officers that Mr. Faulkner was known to be armed and dangerous.  Because the officers reasonably believed Mr. Faulkner was armed and dangerous, they permissibly conducted a Terry

---

[5]    480 U.S. 321 (1987).

frisk, resulting in the discovery of the firearm.  See id.  "Having obtained lawful possession of the firearm[], Officers [Raetz and Senesac] were free to take down the serial numbers" without violating the Fourth Amendment.  Watts, 7 F.3d at 127.  The court finds that seizing the firearm and obtaining its serial number does not violate Mr. Faulkner's Fourth Amendment rights.

## IV.    Law Enforcement Had Probable Cause to Arrest Mr. Faulkner

Mr. Faulkner argues he was arrested without probable cause, because law enforcement did not possess sufficient information to arrest him at the time of the stop.  The government responds that probable cause existed for the arrest because the firearm was reported stolen.

"To justify a warrantless arrest, probable cause must exist."  United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003).  Probable cause is determined from "the totality of the circumstances as set forth in the information available to the arresting officers at the time of the arrest."  United States v. Houston, 548 F.3d 1151, 1154 (8th Cir. 2008) (quoting Adams, 346 F.3d at 1169).  A warrantless arrest complies with the Fourth Amendment "when the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested."  Id. (quoting Adams, 346 F.3d at 1169).  The burden of proof is on the government to justify a warrantless arrest.  See United States v. Skinner, 412 F.2d 98, 103 (8th Cir. 1969).

As discussed above, Officers Raetz and Senesac performed a lawful Terry stop, validly came into possession of Mr. Faulkner's firearm, and discovered

that it was stolen after reporting the serial number.  Accordingly, probable cause existed to believe Mr. Faulkner had committed an offense, namely, grand theft of a firearm.  SDCL § 22-30A-17.  The warrantless arrest therefore did not violate the Fourth Amendment.

### V.    Law Enforcement Conducted a Valid Inventory Search

Mr. Faulkner argues that the inventory search of his vehicle was unlawful, and officers should have permitted him to allow someone to come retrieve the vehicle.  The government responds that because Mr. Faulkner was the only occupant, police protocol dictated inventorying and towing the vehicle.

When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing that an exception to the warrant requirement applies.  Mincey v. Arizona, 437 U.S. 385, 391 (1978) (citing Vale v. Louisiana, 399 U.S. 30, 34 (1970)).  Inventory searches are one of the "well-defined exceptions" to the Fourth Amendment's warrant requirement.  Colorado v. Bertine, 479 U.S. 367, 371 (1987).  This exception "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search." United States v. Garreau, 658 F.3d 854, 857 (8th Cir. 2011).  The routine practice of securing and inventorying a vehicle's contents is a "response to three distinct needs: the protection of the [vehicle] owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger."  South Dakota v. Opperman, 428 U.S. 364, 369 (1976).

23

"The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." United States v. Kennedy, 427 F.3d 1136, 1143 (8th Cir. 2005). Inventory searches that are "conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." Id. Standardized police procedures are necessary to "ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence." Id. (internal quotations and citation omitted). The officer's subjective intent is irrelevant: "[t]he police are not precluded from conducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity." United States v. Marshall, 986 F.2d 1171, 1175–76 (8th Cir. 1993); see United States v. Porter, 859 F.2d 83, 85 (8th Cir. 1988) (per curiam) ("[A]n officer's suspicion that evidence may be present does not invalidate an otherwise lawful inventory search.").

In this case, law enforcement conducted a valid inventory search. Because officers complied with standard department protocol by inventorying and towing the vehicle, the search was reasonable. Garreau, 658 F.3d at 857; Kennedy, 427 F.3d at 1143. Mr. Faulkner now argues that someone should have been permitted to come and remove the vehicle; however, law enforcement was under no obligation to accommodate him in this fashion. The government has met its burden of showing an exception to the Fourth Amendment's warrant requirement. Mincey, 437 U.S. at 391. Because the court finds the

24

search was a lawful inventory search, it need not address whether the search was a valid automobile exception search.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress be denied in full.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 30th day of August, 2018.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge