UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 17-50144 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S OBJECTIONS TO** |
| v. | ) | **MAGISTRATE JUDGE'S REPORT** |
| | ) | **AND RECOMMENDATION** |
| DANA FAULKNER | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW The Defendant by and through his undersigned attorney of Record John M. Fitzgerald and files the following memorandum in support of his objections to the Magistrate Judge's Report and Recommendation ("Report"; Doc. 77) on the defendant's motion to suppress statements (Doc. 38).

## OBJECTIONS

1. The Magistrate Judge's conclusion that "Law Enforcement Performed a Proper Terry Stop." Doc 77 at 13.

2. The Magistrate Judge's finding that, "[t]he facts here therefore satisfy the requirement that there be "some degree of communication" between the officer possessing particularized knowledge and those performing the stop." Doc. 77 at 16.

3. The Magistrate Judge's conclusion that "the Terry stop performed by Officers Raetz and Senesac did not violate the Fourth Amendment."

4. The Magistrate Judge's conclusion that "Mr. Faulkner's Statements Were Not Obtained in Violation of Miranda. Doc. 77 at 16.

5. The Magistrate Judge's conclusion that "Mr. Faulkner's request for an attorney did not in and of itself trigger Miranda's requirements." Doc. 77 at 20.

6. The Magistrate Judge's conclusion that "seizing the firearm and obtaining its serial number does not violate Mr. Faulkner's Fourth Amendment rights.

7. The Magistrate Judge's conclusion that "[t]he warrantless arrest therefore did not violate the Fourth Amendment." Doc. 77 at 22.

8. The Magistrate Judge's finding that "[i]n this case, law enforcement conducted a valid inventory search. Because officers complied with standard department protocol by inventorying and towing the vehicle, the search was reasonable."

9. The Magistrate Judge's finding that the sources of information were sufficiently corroborated. Doc. 77, 3-10.

## MEMORANDUM IN SUPPORT OF OBJECTIONS

Law enforcement did not perform a proper Terry stop as the degree of communication between Investigator Kenrick and Officers Raetz and Senesac was insufficient. No known federal case in the United States of America defines the degree of communication necessary to invoke the collective knowledge doctrine. In this case the defendant disputes that any more than a cursory directive to pull over the white BMW was given to Officers Raetz and Senesac.

## OBJECTIONS 1, 2 AND 3

### I. The Degree of Communication between Investigator Casey Kenrick and Officers Raetz and Senesac was insufficient to invoke the collective knowledge doctrine so as to justify the gun point stop and arrest of the Defendant Dana Faulkner:

### <u>Collective Knowledge Doctrine</u>

"The collective knowledge doctrine imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold an otherwise invalid search or seizure." <u>US v. McClelland</u>, Dist. Court, D. South Dakota 2017 *citing* <u>United States v. Banks</u>, 514 F.3d 769, 776 (8th Cir. 2008). "However, this doctrine presumes a degree of communication between officers and that the officers have shared relevant knowledge which informs the decision to deploy a drug dog. See id. (judging probable cause upon the basis of the combined knowledge of

officers who have shared relevant information). "[If a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop." Id. citing United States v. Hensley, 469 U.S. 221, 232 (1985).

In this case, the defendant has shown that the presumption of communication between Investigator Kenrick and Officer Raetz is rebutted, and therefore insufficient to invoke the collective knowledge doctrine. In United States v. Rowe, 878 F.3d 623, 628 (8th Cir. 2017) the State Trooper knew the basis for the stop:

> Based on the CI's information the Minneapolis police issued an *alert about Oliver's BMW's possible involvement in narcotics trafficking and law enforcement officials including Minnesota State Trooper Thul,* surveilled Interstate 35 in an effort to intercept the car. After being advised that officers involved in the ongoing investigation had located the suspected vehicle, and requested that she stop it, Trooper Thus ultimately spotted it and pulled it over.

Rowe at 627 ¶2. State Trooper Thul was advised of the BMW's possible involvement in narcotics trafficking. Even though she had no first hand knowledge of the criminal activity and/or what the basis for the assertion of narcotic trafficking was, whether it was based on articulable facts and whether those facts were reasonable, she knew what the reasonable suspicion for the stop of the vehicle was, i.e. possible involvement in narcotics trafficking. Because Trooper Thus knew, "about Oliver's BMW's possible involvement in narcotics trafficking," the collective knowledge doctrine imputed the knowledge of the investigating officers who verified the CI's tip in Minneapolis to Trooper Thus.

In United States v. Morales, 238 F.3d 952, 954 (8th Cir. 2001). investigators recorded a conversation between the confidential informant, Varco-Perez and learned after the conversation that Perez intended to give the informant two pounds of methamphetamine. Investigators then

watched a meeting between the informant, Perez and Morales. Investigators then recorded another conversation between Perez and the informant confirming the two pound transaction. Police then stopped Morales' vehicle and discovered two pounds of methamphetamine. In affirming the defendant's suppression motion denial the Court said:

> Our review of the record indicates <u>sufficient </u>communication between the arresting officer and the others involved in the investigation. The arresting officer was intimately involved with the investigation leading to Morales's arrest. Not only was he aware of the conversations between Morales, the informant, and Barco-Perez, the arresting officer also participated in the surveillance of the meeting among the three. Accordingly, we conclude that probable cause existed for the arrest.

<u>Morales</u> at 954. [Emphasis Added]. Since the arresting officers were "intimately," involved with the investigation, aware of the conversations between the informant and Perez and had participated in the surveillance of the meeting between the Morales, Perez and the informant, there was a sufficient degree of communication to impute some missing knowledge to the arresting officers. However, it is not clear from <u>Morales</u> what knowledge the arresting officers would have lacked. In <u>Morales</u> the arresting officers would have known both the nature of the probable cause for the stop and arrest of Morales and the articulable facts supporting the probable cause because they were part of the investigation. Again it is not clear in Morales what was missing.

<u>US v. Williams</u>, 429 F. 3d 767 (8th Circuit 2005), follows a similar note to that of <u>Rowe</u>. In that case, Williams was suspected by DEA agents of trafficking drugs. While under surveillance Williams made several incriminating stops in a vehicle.

> Suspecting that drugs might be in the car, Officer Kelvin Sergeant made a radio request that the Focus be stopped if probable cause could be established to stop the vehicle. The only information transmitted was that there might be controlled substances in the car.

Williams at 770. The vehicle was stopped based on valid traffic infractions for travelling too slowly and crossing the center line. A drug dog was deployed which alerted to the presence of illegal drugs. Crack and Marijuana were found during a search of the vehicle. The Court found the stop and drug dog deployment were valid based on actual traffic infractions but it also upheld the stop alternatively based on the collective knowledge rule:

> In the alternative, we also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop Caldwell's vehicle, and such knowledge was imputed to the officer at the scene when he received Sgt. Sergeant's radioed request. See United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.2001) (collective knowledge imputed to arresting officer when there is some degree of communication).

Williams at 772. Because the Officer at the scene had heard the Sergeant's radio request, "to stop the vehicle.....because there might be controlled substances in the car," the Officer at the scene was imputed with the knowledge of the DEA team that was investigating Williams. Because the on scene officer had heard the Sgt.'s radio transmission he actually did not need to develop his own probable cause to stop the vehicle or deploy the drug dog. The entire breadth of the DEA's knowledge as to Williams was imputed to the on scene officer because he heard the naked assertion from Sgt. Sergeant that there "might be controlled substances in the car." The on scene officer was thereby provided with the reasonable articulable suspicion to stop the vehicle because he heard that another officer said there might be reasonable suspicion to stop the vehicle.

Because Officer Raetz and Senesac stopped the defendant without him having committed any valid traffic infractions the collective knowledge rule and exactly what communications Investigator Kenrick had with Officer Raetz are crucial in this case.

Investigator Kenrick's was not sure whether he told Officer Raetz Diablo was the subject of an investigation or whether Diablo was the subject of a drug investigation.

First Investigator Kenrick testified on cross examination as follows:

> IN. KENRICK:  I tell him [Of. Raetz] that I believe that we have located a subject of an investigation that we are into and the subject named Diablo. And I passed on the information that I believed from the information that I received that he was armed and potentially violent.

On the issue of whether Investigator Kenrick told Officer Raetz that Diablo was the subject of a *drug* investigation, Kenrick responded:

> IN. KENRICK:  And I specifically told him [Of. Raetz] a drug investigation, but when somebody calls him from the Drug Task Force I would assume they would assume it was a drug investigation. So I don't know if I actually told him it was or he assumed it was. *Either one we are correct.*

[Emphasis Added].

Investigator Kenrick was then confronted on cross-examination with the fact that the stopping Officer(s) asked him what to put in the report:

> MR. FITZGERALD:  Okay. Do you recall them saying – well, first one of the officers says, "What do we put in the report?
> You say, "Just this case."
> Then one of the officers says, "Okay."
> And then you say, "You are just going to say in your report that your reason for the stop was that I called you and said that he was a suspect in a drug investigation and needed stopped. Investigative stop. And I told you to take precautions on the stop to justify the use of force. Make sure just do that and I will cover." You say, "More reasons for the stop and call it UNET investigations called and everything."

> IN. KENRICK.  I don't think that is out there, anything I testified to this point. I don't remember specifically saying that, but that's what I said. They need to have justification for pulling their firearms. They have to. They have to report that in a separate way, and that's something that they are going to need covered, and that's why it was– that's why I said to cover your use of force, because I want to make sure those guys aren't put in a dangerous situation and don't have all the information. If I am going to do that, I am going to back them up on why they used whatever choices they did.

MR. FITZGERALD: Okay. And if you had said on that day, as you testified to, that he is the subject of an investigation and they are most likely armed with a firearm, that doesn't really tell them a whole lot?

IN. KENRICK: No. And, again my plan was to have somebody come and relieve my spot on surveillance, meet them at the gas station and give them a further in-depth briefing of what we had. But I received a call and said, "Hey, he is driving the white BMW with Colorado plates; he's in there," and then he drives by me. *So my briefing had to be short to a phone call of "Hey, I need this car stopped."*

[Emphasis Added]. SH 92; 22-25, 93; 1-25, 94; 1-6.

IN. KENRICK: It is our practice to do in-depth briefing when we have other people involved with them. *Sometimes due to the fluid nature of out work, we can't do that all the time.*

[Emphasis Added].

Investigator Kenrick's explanation as to why he would tell the arresting officers Raetz and Senesac what to put in their reports is troublesome and all evidence in this case should be suppressed on that issue alone. However, if all Investigator Kenrick said was, "I tell him [Of. Raetz] that I believe that we have located a subject of an investigation that we are into and the subject named Diablo. And I passed on the information that I believed from the information that I received that he was armed and potentially violent." Then this information would be insufficient to invoke the collective knowledge doctrine.

It is disputed that Investigator Kenrick even told Officer Raetz that Diablo might have a gun or was dangerous because of his explanation as to why he would have said to the Officers what should be in their reports. On that issue he said: "because I want to make sure those guys aren't put in a dangerous situation and don't have all the information. If I am going to do that, I am going to back them up on why they used whatever choices they did." So either Kenrick told Officer Raetz, Diablo was the subject of an investigation and was potentially dangerous and felt

he needed to add, "drug investigation," to back them up on drawing their guns on Dana Faulkner or Kenrick did not tell Raetz or Senesac Diablo was potentially dangerous or there was some other

reason. Whatever the case, there was an abject lack of information given to Officer Raetz.

The lack of information is also backed up by what Faulkner, Officers' Raetz, Senesac and Doyle discussed at the scene. Exhibit 1, Officer Raetz' L3 recording provides the following moments after the stop of the BMW.

16:01:11: FAULKNER: Can I ask what I did, what I'm being charged with?

OF. RAETZ: All in due time, I'm just a pawn at this point okay.

16:02:05: OF RAETZ: Okay sir go ahead and take a seat for me. And as soon as I know everything that's going on I'll make sure you know what we can tell you.

Officer Doyle arrived on scene shortly after the stop. He approached the BMW with Officer Raetz and Senesac. He then had a brief conversation with Officers Raetz and Senesac at the BMW

regarding the stop, the following can be heard on Officer Senesac's L3 recording, Exhibit 2:

16:07:02 OF DOYLE: What was the reason for the stop?

OF RAETZ: What's that?

OF DOYLE: What was the stop?

OF SENESAC: We were told to.

OF RAETZ: We were told to when we saw him by UNET.

OF DOYLE: Fill out a violation report.

OF RAETZ: They said they had enough to get him pulled over.

OF DOYLE: Good enough.

If Officer Raetz had been told that, Diablo the subject of a drug investigation had been located and that he was known to use drugs, armed and dangerous then wouldn't Officer Raetz have told Officer Doyle the same? Instead his response was "We were told to when we saw him by UNET,....they said they had enough to get him pulled over." This is the type of response an Officer would give if he had been told, "hey I need you to stop that car," without being told why.

In regards to what Officer Senesac was told by Officer Raetz he testified as follows on direct:

MS. RICH: The request – did you receive information for a member of UNET or did you receive information from Officer Raetz?

OFC. SENESAC: I received it from Officer Raetz.

MS. RICH:     And did he convey information he had received elsewhere to you?

OFC SENESAC:  Yes.

MS. RICH          What was your understanding of the situation of what you were– of the traffic stop you were supposed to conduct?

OFC SENESAC:     I was informed that the occupant was Dana Faulkner; he was supposed to be driving a white car with Colorado license plates on it; that he is possibly armed with a handgun.

MS. RICH          At the time, did you know his name or did you learn his name throughout the course of the traffic stop?

OFC SENESAC:      It was something I learned later on.

MS. RICH:          Did the name Diablo come up?

OFC SENESAC.     Yes, it did.

MS. RICH:          Had you previously heard about an investigation involving the name Diablo?

OFC SENESAC.       Yes, I have.

MS. RICH.       Where?

OFC SENESAC.       It was in one of our briefings. UNET came to brief us about the subject Diablo.

SH106; 14-25, 107; 1-22

Officer Senesac testified in his first three pages of testimony that he had been told by Officer Raetz that Dana Faulkner [*sic*] was driving a white BMW with Colorado plates and that he was possibly armed with a handgun and that he had previously to the day of the stop had been briefed by UNET on a subject named Diablo-- that Diablo had a beard, flipped back hair and tattoos.

However on cross examination Officer Senesac could not remember when the UNET briefing was, SH 121; 13-14. He admitted his report did not contain any of the alleged information he had learned at the UNET briefing SH 128; 4-7 and admitted all he was told by Officer Raetz was that, "we were going to the Sinclair Gas Station location to meet with Investigator Kenrick and we are going to attempt to make a traffic stop for UNET. SH 128; 22-24.  Officer Senesac knew nothing else:

MR. FITZGERALD:   Did either – well, since you never spoke with Investigator Kenrick, did Officer Raetz tell you that you were supposed to stop the vehicle and that you were supposed to arrest the driver of the vehicle? What did he tell you?

OFC. SENESAC:   All I was informed is that we were going to make a traffic stop on the vehicle.

MR. FITZGERALD: Okay. We you aware of anything else?

OF. SENESAC:   No.

SH 131; 2-10.

Officer Raetz testified on direct that Investigator Kenrick advised in the first initial

conversation that; "we were to assist him by making a traffic stop on a suspect's vehicle on a male he knew only as Diablo at that point in time SH 140; 2-4 , that Diablo was the subject of a drug investigation, SH 140; 7-8, that Diablo was known to be armed with several weapons and that apparently he had a cocaine habit, that Diablo appeared similar to him [Kenrick] a white male with a beard, however thinner. SH 141; 23-24, 142; 1-3.

On cross examination Officer Raetz testified that during this initial conversation with Investigator Kenrick, Officer Senesac was sitting in his car approximately two feet away from Officer Raetz with his window rolled down listening to the conversation. SH 164; 4-7. Officer Raetz testified that either during or immediately after the conversation with Kenrick he gave Officer Senesac a "summary of what Investigator Kenrick told [him]." SH 172; 20-25. That statement directly conflicts with Officer Senesac's testimony regarding only being told that he was going to the Sinclair gas station to assist with a traffic stop.

Officer Raetz was cross examined on his interactions with the Defendant.

|  | MR. FITZGERALD | Is it your practice to tell people that have been stopped and handcuffed, detained, stopped, handcuffed, and arrested, is it your practice to tell them why they have been arrested? |
| SH169; 21-25. | OFC RAETZ: | When they have been arrested, yes. |
|  | MR. FITZGERALD: | At 1602:11 the defendant asked you what's going on and you say, "As soon as I know everything that is going on I will know what I can tell you"? |
|  | OFC RAETZ: | Okay. |
|  | MR. FITZGERALD: | Is it the reason that you didn't tell him what was going on is that he hadn't officially been arrested yet? |
|  | OFC RAETZ: | No. The reason that I didn't have anything to tell him was I had yet to make contact with Investigator |

Kenrick to be advised what the probable cause was
or any other further information was.

SH 170; 7-16. Officer Raetz's response as to why he did not tell the defendant what was going on

is easy to understand. Officer Raetz had been told there was probable cause to stop the car he just

had not been told what that probable cause was and so there was nothing to tell the defendant.

Officer Raetz, according to his testimony had been advised by Investigator Kenrick prior

to the stop that Diablo was the subject of a drug investigation, known to use cocaine and carry

firearms. Being the subject of a drug investigation, being known to use cocaine and carry

firearms would constitute three separate felonies. If Officer Raetz would have known these facts,

he could have told the defendant, "you're the subject of a drug investigation and we were told to

stop you." Or, "you're a known cocaine user who carries guns." However Officer Raetz's

response is, "No. The reason that I didn't have anything to tell him was I had yet to make contact

with Investigator Kenrick to be advised what the probable cause was or any other further

information was." Does not Officer Raetz really mean by this response that, he needed to contact

Investigator Kenrick to find out why he had stopped the defendant?

Finally Officer Raetz was cross examined on his responses to Officer Doyle at the BMW.

| MR. FITZGERALD: | Okay. Do you recall a conversation where Officer Doyle asked what the reason for the stop was? |
| OFC RAETZ: | I do not. |
| MR. FITZGERALD: | Do you recall telling him: we were told to when we saw him; they said they have enough to get him pulled over? |
| OFC RAETZ: | I don't directly recall it, no. |
| MR. FITZGERALD: | Isn't it true that if you had actually known the things that you stated you knew in your report, that being Diablo was the subject of a drug investigation, |

|  | known to carry cocaine, and cocaine carrying several weapons isn't it true if you knew that you would have told Officer Doyle that? |
| OFC RAETZ: | I didn't know if he was in fact at that point in time in my report, I didn't know if any of that was true. At that point in time when I was talking to Officer Doyle, still don't know - - at that point in time still didn't have any information as to other than what Investigator Kenrick said about the drug use, but the found weapon we secured off him we did know. |

SH 171 8-25, 172; 1-1. It is somewhat inconceivable that Officer Raetz would have to first confirm the information Investigator Kenrick had given him before he could tell officer Doyle about it. If Investigator Kenrick had told Officer Raetz that Diablo was the subject of a drug investigation, known to use cocaine and carry firearms it is highly likely he would have told Officer Doyle about those facts. Especially since finding the firearm would have confirmed the information Investigator Kenrick had given to Officer Raetz.

The lack of knowledge as to what the probable cause or reasonable suspicion was to stop the white BMW was, was reiterated on re-direct by Ms. Rich.

| MS. RICH: | You were asked about the defendant had asked you as you were escorting him over to the patrol vehicle about something: can you tell me why I m under arrest? Or can you tell me why I got pulled over, or something along those lines? |
| OFC RAETZ: | Yes, ma'am. |
| MS. RICH: | You indicated all in due time. Now, you didn't convey to him, the defendant, what Investigator Kenrick told you about the reason for the stop? |
| OFC RAETZ: | No, I did not. |
| MS. RICH: | Why not? |
| OFC RAETZ: | *At that point in time Investigator Kenrick hadn't* |

*advised me what the probable cause was; just that there was probable cause.*

[Emphasis Added]. SH 181; 6-19. This line of questioning again shows that Officer Raetz had not been told anything other than to stop the white BMW and that there was probable cause to do so. While probable cause is not required to stop a vehicle it is clear that Officer Raetz was not told there was reasonable suspicion to stop the vehicle. If Officer Raetz had indeed been told the information he says he was told then the probable cause for the stop of the vehicle would have been that the driver of the vehicle was the subject of a drug investigation, known to possess cocaine and carry firearms consequently probable cause would have satisfied the reasonable suspicion requirement.

If Officer Raetz had been given any of the pertinent facts then he may have told the defendant why he had been stopped and arrested at gun point. Further Officer Senesac and Officer Raetz probably would have discussed why they stopped the defendant at the scene and there would have been no need for the officers to ask Investigator Kenrick what do "we," put in the report. And most importantly Investigator Kenrick would not have told the Officers what to put in their reports:

| | |
|---|---|
| OFC. SENESAC: | What do we put in the report? |
| INV. KENRICK: | Just this case. |
| RAETZ OR SENESAC: | Okay. |
| INV. KENRICK: | You're just going to say in your report that your reason for the stop was that I called you and said that he was a suspect in a drug investigation and needed stopped, investigative stop. And I told you that he was armed and essentially dangerous and told you to take precautions on the stop-to justify your use of force. Make sure, just do that and I will cover just say more reasons for the stop and call it |

UNET investigations called and everything.

RAETZ OR SENESAC:          Gotcha.

Exhibit 2 at 16:11:39. Exhibit 3 at 16:11:39.

Accordingly, this part of the report is where, "UNET investigations called." Other than the fact that both reports contain identical first paragraphs the time frames are incorrect.  The stop of the defendant occurred at 3:59 P.M. the Government's Exhibit 6 shows that the first message Investigator Kenrick received from SOI#5 alerting him that Diablo was in town, was at 2:58 PM making the Officers' 2:30 P.M. not possible. From that point in time Investigator Kenrick would had to have called Sgt. Alexander and then have made contact with Officer Raetz. This would have easily placed the time frame for the phone call to Officer Raetz somewhere around 3:10 P.M. or 3:15 P.M.  However, the testimony of each officer shows that when Raetz received or made the first phone call from Investigator Kenrick, the first phone call came with Diablo's location.

The Government's Exhibit 7 shows that the map of Diablo's location is not sent to the SOI#2 until 3:25:12. P.M. Investigator Kenrick would have then called Sgt. Alexander and then Officer Raetz. Making the first phone call to Officer Raetz at 3:35 or 3:40 or later. Officer Senesac's testimony indicates Officer Raetz did not receive the first phone call from Investigator Kenrick until Kenrick knew Diablo's location or sometime after 3:25:12.

MR. FITZGERALD: Well, from the first time you received information that you are going to go the Sinclair Gas Station and meet up with Officer Kenrick?

OF. SENESAC:     I don't know the time frame, but it was all in sequence as we were going there [Sinclair Gas Station] we got the phone call to - - [Stop the BMW].

SH 129: 17-22. Officer Senesac admitted on cross examination that he was unsure of the

"approximately 1430 hours," he agreed it could be a mistake. SH 130: 3-5.

Officer Raetz's direct testimony also places the first call from Investigator Kenrick as occurring sometime after 3:25:12 P.M. since Raetz indicates the first call from Kenrick came with a location of the Sinclair gas station area.

> MS. RICH            And did you have numerous conversations on the phone
>                     with Agent Kenrick?
>
> OF RAETZ:           Essentially we had two conversations in total. The first one
>                     telling us what he would like us to do and putting us in the
>                     location. Then *shortly* after that, he called us back with the
>                     identity of a white BMW bearing Colorado license plates.
>                     He advised that the subject Diablo was driving that vehicle
>                     and he requested that Officer SENESAC and I conduct our
>                     traffic stop on that vehicle.

[Emphasis Added]. SH 140:15-24. When confronted with the incorrect time frame (1430-1559) Officer Raetz defended it stating it could have been the result of traffic. SH165:12-15.

In conclusion, an insufficient degree of communication took place on August 28, 2017, between Officers Raetz and Senesac and Investigator Kenrick to invoke the collective knowledge doctrine.

## OBJECTIONS 4, 5 AND 6

## II. Faulkner's Statements Were Obtained in Violation of Miranda and Schatzner

On the way back to the police cruiser in handcuffs, at 16:01:10 Exhibit 2, and in the presence of both Officers, Faulkner states, "I want an attorney present for all questioning." Officer Raetz replies, "I'll be sure not to ask you anything." At this point Faulkner has unequivocally requested an attorney. He has done so because he knows and understands he is under arrest and that his freedom has been curtailed in a significant way.

Faulkner invokes a second time at minute 16:02:10, Exhibit 2, Faulkner states, "Can you

call an attorney for me to be present at all searches or anything?" Officer Senesac replies, "We do not do anything like that." Officer Senesac logs Faulkner's arrest officially in the dispatch log at 16:02:44.

However, Raetz does question Faulkner in direct violation of Faulkner's invocation of counsel, Maryland v. Shatzer, 130 S. Ct. 1213, (SC 2010), and after his arrest without Miranda warnings, Miranda v. Arizona 384 US 436, (S Ct. 1966). At 16:04:01, Officer Raetz asks Faulkner, "Is your concealed carry permit in there?" Do you have a concealed carry permit in there?" You do not have a concealed carry permit in there?" Faulkner's responds in the negative. This class one misdemeanor arrestable offense, is used as probable cause to search the serial number from the weapon obtained on Faulkner.

## OBJECTION 7

### III. Faulkner's Arrest Violated the 4th Amendment to the United States Constitution

Officer Raetz logs Faulkner's arrest officially in the dispatch log at 16:02:44, some three and a half minutes after the gunpoint stop and arrest. No drugs have been found on Faulkner's person, law enforcement does not know the gun on Faulkner was stolen and law enforcement does not know Faulkner is concealing a weapon without a permit.

Officer Raetz was cross examined as to Defendant's Exhibit A or the command log.

|  |  |
|---|---|
| MR. FITZGERALD: | Okay. This is the command log that's previously been admitted as Defendant's Exhibit A. I would direct your attention to spot right here in all caps where it says "Arrest." Then to the left of that "ID 663." That is your identification number, correct? |
| OF. RAETZ: | Yes. |
| ME. FITZGERALD: | It says, "Arrest." You transmitted that information to dispatch at 2:44, is that true? |
| OF RAETZ: | It looks like it says 4:04. Or correction, 4:02. I apologize. |
| ME. FITZGERALD: | 1602:44. Right. 4:02. But you were requested to just |

stop the vehicle?

OF RAETZ:            Yes.

SH 167; 20-25, 168; 1-7.  Although Officer Raetz testified he did not recall transmitting this information to dispatch, the command log provides otherwise. Not only was the term "Arrest," sent to dispatch at 1602:44, by Officer Raetz prior to the discovery of probable cause at the scene, Exhibit A provides that another arrest code was sent to dispatch by Officer Raetz at 16:05:44. That code is "10-16 Person."  10-16 is ten code for prick up prisoner. Even though this code was transmitted after Faulkner had unconstitutionally admitted to Officer Raetz he possessed a concealed weapon without a permit, Exhibit 2 at 16:04:04, Raetz does not transmit arrest after this admission. He transmits "pick up prisoner," a code which would logically follow after an arrest.

The Government questioned Officer Raetz and although he testified  he would have only used the term arrest followed by a ten code he made many entries on the command log without using a code, "Traffic Stop," "Ro Neg 29S," "one proned out," "check status one detained."

Finally Officer Senesac's 10-15 or "we have prisoner in custody," was made at 16:18:10 Exhibit A and Exhibit 2. This information was logically transmitted to dispatch only 10 seconds before Officer Senesac began his drive with the defendant to the jail. It would be logical to transmit this information to dispatch so that the jail would know a prisoner was en route.

## OBJECTION 8

### IV. Law Enforcement Did Not Perform a Valid Inventory Search.

No testimony was given at the suppression hearing that the Rapid City Police Department complied with any standardized protocols in inventory-searching the BMW. Further the Government's Exhibit 1 shows law enforcement inventory-searching places which are not

commonly used to store valuables, like underneath the hood of the BMW, inside the lid of the trunk and inside the bumper.

## OBJECTION 9

**V. Law Enforcement's Sources of Information were not Sufficiently Corroborated.**

The Court should look at in-custody corroboration as per se less reliable. The Court should do this because people who are in custody inherently talk to one another about their cases and the intimate aspects of those cases. Information and details necessarily about a particular case can be hijacked by anyone prisoner willing to listen and used for their own purpose.

Every source of information including SOI#7 and aside from source of information 5, the wife of SOI#2 was in custody in either Pennington County or Meade County when Investigator Kenrick spoke to them. SH 78: 10-13.

SOI#1 came to the attention of Investigator Kenrick in May of 2017. SH 5: 7-14. The affidavit in support of the complaint provides:

> 6). SOI# 1 also informed law enforcement that SOI#4 sold multiple pounds of methamphetamine and heroin for "Diablo." Additionally, SOI #1 informed law enforcement that SOI#3 dealt multiple pounds of methamphetamine for "Diablo" [SOI#1?] Diablo's practice is to bring heroin methamphetamine, and cocaine in the tires of whichever vehicle he transports the controlled substances in from Colorado to South Dakota. Once "Diablo" arrives in Rapid City, he goes to SOI#3's house and unloads the controlled substances, which are further distributed from SOI#3's house to others.

As to whether or not law enforcement surveilled the location of SOI#3's house, Investigator Kenrick agreed that "[w]e had a description, but that's fairly thin when we don't have anybody out with realtime information saying he is in town right now. If we had received information like that, that he is in town, some of these locations we could have put up

surveillance on, I agree with that. SH 74: 9-13.

Investigator Kenrick's first reported contact with SOI #2 does not come until August 2, 2017. The contact occurs when Investigator Kenrick executes a search warrant on SOI#2's hotel room uncovering illegal drugs and a handgun. SH11; 12-22. Investigator Kenrick then interviewed SOI#2 who stated the following:

> IN. KENRICK: He [SOI#2] admitted to selling heroin, methamphetamine, and cocaine for Diablo. Again, he only knew of that subject's name as Diablo at the time. He indicated that he'd been dealing with him somewhere in the time period of five to six weeks prior to out interaction. And he estimated at that time that his quantities were in half pound area.

> ......

> IN. KENRICK: He [SOI#2] described meeting Diablo through SOI number 1.

SH12; 7-14. However Investigator Kenrick testified that according to SOI #1:

> [SOI#1 was] Dealing with this debt that he owed the subject named Diablo, he was in fear for his safety and his family's safety. And at some point SOI – who is referred to as SOI number 2 met up with him, told him about the situation. *Somehow unbeknown to SOI-1, SOI2 is familiar with Diablo and had taken at the behest of Diablo SOI number 1 to rural Meade County under the guise of picking up a car.* SH8:7-13.

Obviously if it was unknown to SOI#1 that SOI#2 knew Diablo then SOI#2 did not meet Diablo through SOI #1. Therefore the information was not independently verified on this point. Investigator Kenrick provided further that:

> Prior to the contact, I had SOI-2 inform me they were supposed to pick up a vehicle that belonged to SOI number 3. SOI-2 explained to me that the vehicle contained drugs and money and nobody wanted to mess with the vehicle because it belonged to Diablo. At that point, SOI number 3 was in jail for unrelated issues,

so the vehicle was being stashed at someone's house until he was able to get out of jail.

MS. RICH:    Was the vehicle located and stopped by law enforcement?

SH16; 16-25,

IN. KENRICK:    It was.

MS. RICH:    Someone other than SOI-3 was driving, is that correct?

IN. KENRICK:    The person that SOI number 3 had stashed the vehicle name was Blake Barber. He was driving the vehicle at the time.

MS. RICH:    Was the vehicle searched?...What did law enforcement find?

IN. KENRICK:    Handgun, scales, methamphetamine, heroin, cocaine, baggier, nearly $16,000 in money, a Pennington County Sheriff's office badge.

SH 17; 1-11.

The affidavit in support of the complaint, (DOC. 1-1) filed (08/30/17) provides a different version of the facts with no mention of SOI#2's involvement or prior knowledge of the contents of the car:

> 10. On 8/2/17 SOI#3's vehicle was stopped by law enforcement. During a search of the vehicle law enforcement located approximately $16,000 cash, suspected methamphetamine, heroin, cocaine, a firearm and a stolen Pennington County Deputy badge. SOI #3 told law enforcement the money in the vehicle belonged to "Diablo" and alluded to it being drug money. SOI#3 denied knowing "Diablo's true identity. SOI#3 indicated he/she was carrying a firearm because he/she was fearful of "Diablo" and his threats of violence. When asked who was going to be responsible for the money being seized by law enforcement from the vehicle, SOI#3 started to cry and said "Diablo" would hold SOI#3 responsible for it. SOI#3 appeared to law enforcement to be genuinely scared of "Diablo."

SOI#2 was not a reliable source of information. Investigator Kenrick did not speak with

SOI #2 after the arrest of Faulkner. In fact, "I never actually talked to him in person ever again until, I believe, a proffer interview." SH 96: 22-23. SOI #2 never officially became a confidential informant, had some drug issues and attacked a woman at Wall greens, (Investigator Kenrick did not know the details of this incident). SH 97: 7-12.

SOI#3 admitted working for Diablo but seemed to deny the drugs were brought to his house. SH20: 1-2. SOI#4 mentioned SOI number 2 as selling drugs for Diablo. SOI#4 also mentioned that SOI#3 was in debt to Diablo for $150,000 which was the same information that SOI#3 had conveyed to investigator Kenrick. SH 22:17-23. SOI #6 provided that she also sold illegal drugs for Diablo and that Diablo brought large quantities of drugs to South Dakota from Colorado. She also mentioned Diablo carried firearms. SH24: 1-25. All of the informants gave a description of Diablo as being a white male with sleeve tattoos and a beard.

However even though the investigation began in May of 2017 with SOI#1's information about Diablo bringing up drugs from Colorado to SOI#3 house, law enforcement was unable to independently verify any of the tips. Diablo was allegedly involved in trafficking large amounts of methamphetamine from Colorado to Rapid City, perhaps as much as 3 times per week with loads as large as 30 pounds. Even with that amount of alleged activity law enforcement was unable to place Dana Faulkner in Rapid City, at any time in 2017 prior to his arrest. SOI#2 even advised law enforcement that Diablo intended to be in Rapid City, during the week of August 7th to kill three people, law enforcement did not locate Dana Faulkner in Rapid City during that time. SH80; 6-18. The information was simply to thin to act on or not an efficient use of resources.

Law enforcement was unable to place Dana Faulkner with any of the sources of information or at any of the locations the sources of information said he could be located at. Finally on the day of the arrest Dana Faulkner did not meet with SOI#2 and was witnessed driving away from the location.

Dated this 13th Day of September, 2018.

FITZGERALD LAW FIRM
A Professional Law Corporation

/s/ John M. Fitzgerald
625 ½ Main Street; Ste 2
Rapid City, SD 57701
(605) 716-6272 Office
(888) 642-4341 Facsimile
john.fitzgerald@fitzgeraldfirm.com